**LEASCO DATA PROCESSING EQUIPMENT CORPORATION, Leasco World Trade Company (U.K.) Ltd., Plaintiffs-Appellees,**

v.

**Robert MAXWELL et al., Defendants-Appellants.**

**LEASCO DATA PROCESSING EQUIPMENT CORPORATION, Leasco World Trade Company (U.K.) Limited, Plaintiffs-Appellants,**

v.

**Isidore KERMAN, Defendant-Appellee.**

Nos. 278, 138–142, Dockets 71–1563, 72–1638–72–1640, 72–1611 and 72–1654.

United States Court of Appeals, Second Circuit.

Argued Nov. 11, 1971, and Sept. 26, 1972.

Decided Oct. 30, 1972.

Anthony F. Phillips, New York City (Willkie, Farr & Gallagher and Jack David, New York City, of counsel), for plaintiffs-appellants.

Howard A. Heffron, Washington, D. C., for defendant-appellee, Isidore Kerman.

Frederick B. Boyden, New York City (Shaw, Bernstein, Scheuer, Boyden & Sarnoff and Helen E. Freedman, New York City, of counsel), for defendant-appellant Robert Maxwell.

John S. Martin, Jr., New York City (Martin & Obermaier, New York City, of counsel), for defendant-appellant Chalmers, Impey & Co.

Peter K. Leisure, New York City (Curtis, Mallet-Prevost, Colt & Mosle and Ernest A. Gross, John P. Campbell, John E. Sprizzo, Peter A. Kalat, and Robert S. Lipton, New York City, of counsel), for defendants-appellants Robert Fleming & Co. Limited and Robert Fleming, Inc.

Maurice N. Nessen, New York City, (Nickerson, Kramer, Lowenstein, Nessen & Kamin, New York City, of counsel), for defendants-appellants Isthmus Enterprises, Inc., Maxwell Scientific International, Inc. and MSI Publishers, Inc.

Anthony F. Phillips, New York City (Willkie, Farr & Gallagher, Howard C.

Buschman, III, Jack David and Mary F. Kelly, New York City, of counsel), for plaintiffs-appellees.

Before FRIENDLY, Chief Judge, FEINBERG, Circuit Judge, and DAVIS, Associate Judge.*

FRIENDLY, Chief Judge:

This case, in which the plaintiffs (hereinafter collectively referred to as Leasco) seek large damages allegedly resulting from the purchase of shares of a British company on the London Stock Exchange, first came to our attention in October, 1971, on Leasco's appeal from a judgment entered by Judge Lasker in the District Court for the Southern District of New York, 319 F.Supp. 1256, dismissing the complaint as against defendant Isidore Kerman, a London solicitor, for lack of jurisdiction over the person. Consideration of the questions presented by that appeal led us to wonder whether, because of the foreign elements in the transaction in suit, the district court had jurisdiction over the subject matter. As that issue had not been briefed or argued, we gave the parties an opportunity to submit further briefs, and, since the issue was of obvious interest to other defendants, also invited them to furnish briefs. Plaintiffs' counsel advised that this question as well as claims of lack of personal jurisdiction as to other defendants were *sub judice* before Judge Ryan in the Southern District and suggested that the best course might be to withhold decision on Leasco's appeal from the judgment dismissing its complaint against Kerman until the entire matter could come before us. Following that suggestion, we awaited Judge Ryan's decision. He denied all the motions but certified the issues of *in personam* and subject matter jurisdiction pursuant to 28 U.S.C. § 1292(b). We granted leave to appeal.

The story of the circumstances underlying this action, a complicated one at best, is still harder to tell because there has thus far been no trial and the facts have not been determined. Yet the issue of subject matter jurisdiction and even, in some instances, that of personal jurisdiction depend on what the facts were. Conceding that, on the issue of subject matter jurisdiction, Leasco at this stage would be entitled to every favorable inference, Steele v. Bulova Watch Co., 344 U.S. 280, 284, 73 S.Ct. 252, 97 L.Ed. 252 (1952), defendant Maxwell suggests that we are likely to get somewhat closer to the truth if we disregard Leasco's affidavits subsequent to the motion to dismiss for lack of subject matter jurisdiction and look to its answers to defendants' interrogatories, which were made before that issue was raised. In the main we shall follow that course, without thereby implying that broader assertions in Leasco's later affidavits would have been disregarded if they were necessary to our decision. We add that if a trial should disclose that the allegedly fraudulent acts of any of the defendants within the United States were non-existent or so minimal as not to be material, the principles announced in this opinion should be applied to the proven facts; the issue of subject matter jurisdiction persists.

## I. The Facts Claimed by Leasco

The gist of the complaint is that the defendants conspired to cause Leasco to buy stock of Pergamon Press Limited ("Pergamon"), a British corporation controlled by defendant Robert Maxwell, a British citizen, at prices in excess of its true value, in violation of § 10(b) of the Securities Exchange Act and the SEC's sufficiently known Rule 10b–5. According to Leasco, and—as we shall not always repeat—we here state only Leasco's version, the first contact occurred early in 1969 when Maxwell came to Great Neck, N. Y., where Leasco then had its principal office, and proposed to Saul Steinberg, Chairman of Leasco, that Pergamon and Leasco engage in a joint venture in Europe. Maxwell falsely told Steinberg that Pergamon had a

---

* Of the United States Court of Claims, sitting by designation.

computerized typesetting plant in Ireland and gave Steinberg the most recent Pergamon annual report, which contained untruthful and misleading statements of Pergamon's affairs. Steinberg telephoned Maxwell in London to decline the joint venture; Maxwell invited him to come there to discuss areas of possible cooperation.

Steinberg and Robert Hodes, a director of Leasco, met Maxwell at the latter's London office in late April, 1969; Maxwell made various false or exaggerated statements of Pergamon's performance and prospects. When he suggested that Pergamon could acquire Leasco's European operations, Steinberg responded that Leasco would be interested only in acquiring Pergamon and its related companies. Clark, a director of Pergamon, entered the room, Maxwell having left for a short time, and whetted Leasco's interest by falsely touting the profitability of International Learning Systems Company (ILSC). Pergamon was a 50% owner and had an option to acquire the other 50% of ILSC. When Maxwell rejoined the group, he told Steinberg and Hodes that Ladislaus Majhtenyi, an official of Pergamon Press, Inc., an American subsidiary whose stock was traded on the American Stock Exchange, would provide Leasco with all financial data necessary to evaluate the worth of Pergamon and the Maxwell-related companies.

In late April or early May, Michael Gibbs, Leasco's director of corporate planning, met in New York with Majhtenyi. The latter said that the Pergamon and Maxwell operations were very profitable. He added that Pergamon was in the process of acquiring MSI Publishers, Inc. (MSI) and falsely spoke in glowing terms of the profitability of that company's operations in selling Pergamon back issues in Canada, Mexico and South America. This was followed by telephone calls between Maxwell and Steinberg; in some (or perhaps all) of the calls, one (or perhaps both) of the participants were in the United States. Maxwell reported enthusiastically, and

falsely, about sales of ILSC encyclopedias in Australia. Expressing surprise at the paucity of information Majhtenyi had given to Gibbs, he said he would meet Steinberg in New York City.

The meeting occurred at a hotel in early May; Maxwell, with Majhtenyi present, made various misrepresentations about the sales and earnings of Pergamon and ILSC. Around May 17 Maxwell mailed a letter from London to Leasco in New York enclosing a dozen documents. Among these were a false report of ILSC's profits; a draft of the 1968 Pergamon annual report, certified by defendant Chalmers, Impey & Co., containing false reports of profits; and a misleading report on Pergamon's affairs, prepared by Whinney, Murray & Co., accountants retained by defendant Robert Fleming & Co. Ltd. (Fleming Ltd.), a London banking firm whose clients were large holders of Pergamon stock and which also acted as financial adviser to Pergamon. Late in the month Maxwell, in London, called Steinberg, in New York; he said that any contract for the takeover would have to be signed before the Pergamon annual meeting cn or about June 19. As a result, Gibbs and Schwartz went to London around May 30 and met for four days with Maxwell, Clark, Kerman (a director of Pergamon and Pergamon Press, Inc. and senior partner of a large London firm of solicitors which represented Pergamon and the Maxwell family interests), and others. Many further misrepresentations with respect to Pergamon and ILSC were allegedly made by Maxwell. The meetings were followed by telephone conversations between Maxwell in London and Steinberg in New York, in the course of which Maxwell is claimed to have made further false statements, especially with respect to Pergamon's profits from the sale of back issues. Around the same time Richard Fleming, chairman of Fleming Ltd., and Lawrence Banks, president of its American subsidiary, Robert Fleming, Incorporated (Fleming, Inc.), visited Leasco's offices in New York and told

**1332**

Schwartz and Hodes that Pergamon was far more valuable than the price Leasco was proposing to pay; in effect they also vouched for the correctness of the Whinney Murray & Co. report.

Later Maxwell telephoned from London that the contract would have to be signed on or before June 17. He and Paul DiBiase, a member of Kerman's firm, arrived in New York shortly thereafter. In the course of a series of meetings, he told Leasco that the condition of Pergamon and its related companies could accurately be determined by relying on the public financial statements certified by Chalmers, Impey & Co. Allegedly these statements misrepresented the profits of Pergamon and ILSC and included a false statement with respect to a large payment from MSI. Other oral misrepresentations were made. Banks, who was present during some of the meetings, repeated that the proposed price was too low and that Fleming Ltd. might oppose the offer if Leasco did not agree to terms satisfactory to Fleming. The upshot was an agreement between Leasco and Maxwell signed in New York on June 17, 1969. This provided that, subject to certain conditions, Leasco would offer to acquire each outstanding share of Pergamon for 37 shillings in cash or Leasco debentures plus, in respect of each 10 Pergamon shares tendered, a 5-year warrant to acquire from Leasco one Pergamon share for 42 shillings. Among the conditions were acceptance by not less than 51% of the Pergamon shares and the obtaining of all necessary United Kingdom exchange control permits. The tender offer was to comply with the Code on Take-Overs and Mergers of the City of London and the regulations of the London Stock Exchange. Maxwell agreed to accept the offer and procure the assent of "the Maxwell interests," to recommend acceptance by the Pergamon shareholders, and to use his best efforts to obtain a similar recommendation by

the Pergamon board of directors. The closing was to be had at the office of Fleming Ltd. in London, unless otherwise agreed. Leasco was permitted to cause the offer to be made by a wholly-owned subsidiary (or a wholly-owned subsidiary of such subsidiary), providing Leasco remained responsible for the due performance of its obligations.

Apparently Steinberg and Hodes accompanied Maxwell back to England. There he told them, on June 18, that it would be in Leasco's interest to purchase Pergamon stock on the open market as soon as possible. At a press conference Maxwell stated that Pergamon's overdraft was less than £500,000, whereas in fact it was approximately £2,500,000. Later in June, Maxwell, from London, called Steinberg, in New York,[1] and said that there were rumors of a counter-takeover bid and that it would be in Leasco's interests to purchase Pergamon stock to prevent this. Leasco claims that if there were any such rumor, the defendants instigated it. On June 20 Leasco, acting through the London banking firm of N. M. Rothschild & Sons ("Rothschild") began buying Pergamon shares on the London Stock Exchange. By July 24 it purchased 5,206,210 such shares, expending some $22,000,000; later it learned that some 600,000 of these shares had been secretly sold by one or more of the defendants. The stock was paid for with cash furnished by a wholly-owned subsidiary, Leasco International N. V. (Leasco N. V.), a Netherlands Antilles corporation, which had recently sold to a group headed by two United States underwriters $40,000,000 of 5% debentures and $20,000,000 of 7% notes for offering only outside the United States and to persons not nationals or citizens thereof or resident or normally resident therein. Both the debentures and the notes were unconditionally guaranteed by Leasco, and the debentures were convertible into its common stock.

1. Defendant Maxwell contends it was impossible that the call was made to New York since Steinberg could not have re-turned there sufficiently in advance of the initial open-market purchase.

Investigation of Pergamon's affairs by Leasco, authorized by the June 17 agreement, caused Leasco's representatives to make further inquiries of Maxwell in England; many of his responses are alleged to have been false and misleading. In early August, Leasco's representatives met with Maxwell, Majhtenyi and others in Elmsford, N. Y.; Leasco was provided with data indicating that previous representations on the subject of sales of back issues had been misleading. As a result of this and other information, Leasco declined to go forward with the tender offer. However, it was left with the $22,000,000 of Pergamon stock acquired on the London Stock Exchange. Leasco seeks damages in that amount, together with exemplary damages.

We shall reserve the statement of further facts relevant to the issue of personal jurisdiction over those defendants who raise that issue until we have disposed of the question of subject matter jurisdiction.

## II. *Subject Matter Jurisdiction*

One of the few points on which all parties are in accord is that subject matter jurisdiction depends on the applicability of the Securities Exchange Act. Leasco's principal place of business is in New York. Defendants Isthmus Enterprises, Inc., Maxwell Scientific International, Inc., and MSI Publishers, Inc. appear to have their principal offices in New York, and this is stated to be true of defendant Robert Fleming, Inc. Plaintiff Leasco World Trade Company (U.K.) Limited, the reason for whose joinder is not apparent, is a British corporation, and most of the defendants are British citizens or corporations. There is thus no jurisdiction under 28 U.S.C. § 1332(a). However, § 27 of the Securities Exchange Act vests the district court with jurisdiction over an action "to enforce any liability created by this title or the rules and regulations there-

under . . . ." Section 10(b) makes it unlawful, *inter alia,* for any person

> by the use of any means or instrumentality of ·interstate commerce or of the mails . . .

> . . . . . .

> To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

We see no need for quoting Rule 10b–5, since this does not affect the question of subject matter jurisdiction; Leasco plainly alleged enough to show a violation of the Rule if the statute is applicable.[2]

 It will be useful at the outset to differentiate the problem here presented from the point decided in Schoenbaum v. Firstbrook, 405 F.2d 200 (2 Cir.), modified with respect to the issue of liability of one set of defendants, 405 F.2d 215 (2 Cir. 1968), cert. denied, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969). *Schoenbaum* held § 10(b) to be applicable, *even when the fraudulent acts were all committed outside the United States* and the security was that of a foreign company doing no business in the United States, in a case where "the transactions involve stock registered and listed on a national securities exchange, and are detrimental to the interests of American investors." 405 F.2d at 208. If we treat the matter in terms of the distinctions drawn in the Restatement (Second) of Foreign Relations Law of the United States (1965), *Schoenbaum* raised the problem, considered in § 18, of the circumstances in which "[a] state has jurisdiction to prescribe a rule of law attaching legal consequences to con-

2. Section 3(a)(17) defines "interstate commerce" to include transportation or commerce" to include transportation or communication "between any foreign country and any State."

duct that occurs outside its territory and causes an effect within its territory . . ." and consequently may be thought to have meant to do so. If all the misrepresentations here alleged had occurred in England, we would entertain most serious doubt whether, despite United States v. Aluminum Co. of America, 148 F.2d 416, 443–444 (2 Cir. 1954), and *Schoenbaum*, § 10(b) would be applicable simply because of the adverse effect of the fraudulently induced purchases in England of securities of an English corporation, not traded in an organized American securities market, upon an American corporation whose stock is listed on the New York Stock Exchange and its shareholders. *Cf.* Vanity Fair Mills, Inc. v. T. Eaton & Co., 234 F.2d 633 (2 Cir.), cert. denied, 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956). It is true, as Judge L. Hand pointed out in the *Aluminum* case, *supra*, 148 F.2d at 443, that if Congress has expressly prescribed a rule with respect to conduct outside the United States, even one going beyond the scope recognized by foreign relations law, a United States court would be bound to follow the Congressional direction unless this would violate the due process clause of the Fifth Amendment. However, the language of § 10(b) of the Securities Exchange Act is much too inconclusive to lead us to believe that Congress meant to impose rules governing conduct throughout the world in every instance where an American company bought or sold a security. When no fraud has been practiced in this country and the purchase or sale has not been made here, we would be hard pressed to find justification for going beyond *Schoenbaum*.

■ On plaintiffs' version of the facts, that issue does not here arise. The instant case deals rather with the problem considered in the Restatement's § 17, "Jurisdiction to Prescribe with Re-

spect to Conduct, Thing, Status, or other Interest within Territory." While the black letter seems to require that, in a case like this, not only there should be conduct within the territory but also the conduct relate "to a thing located, or a status or other interest localized, in its territory," Comment A and Illustrations 1 and 2, the latter of which [3] is quite pertinent here, appear to be satisfied if there has been conduct within the territory. Conduct within the territory alone would seem sufficient from the standpoint of *jurisdiction* to prescribe a rule. It follows that when, as here, there has been significant conduct within the territory, a statute cannot properly be held inapplicable simply on the ground that, absent the clearest language, Congress will not be assumed to have meant to go beyond the limits recognized by foreign relations law. Defendants' reliance on the principle stated in Foley Bros. v. Filardo, 336 U.S. 281, 69 S.Ct. 575, 93 L. Ed. 680 (1949), that regulatory statutes will generally not be construed as applying to conduct wholly outside the United States, is thus misplaced. However, it would be equally erroneous to assume that the legislature always means to go to the full extent permitted. This is a question of the interpretation of the particular statute, which we will consider below with specific reference to § 10(b).

■■ We would not wish defendants to think that in thus defining the issue we have failed to consider their argument that the critical misrepresentations, if such they were, were made in England during the four days of meetings in early June and in the interval between the signing of the agreement in New York and the beginning and continuation of the purchases on the London Stock Exchange. Even limiting ourselves to plaintiff's answers to defendants' interrogatories, as defendant Max-

3. X and Y are in state A. X makes a misrepresentation to Y. X and Y go to State B. Solely because of the prior misrepresentations, Y delivers money to X. A has jurisdiction to prescribe a criminal penalty for obtaining money by false pretenses.
Restatement (Second) of the Foreign Relations Law of the United States 45.

well suggests, there were abundant misrepresentations in the United States. Maxwell's initial misrepresentations were made here, although then in a context of seeking to interest Steinberg in a joint venture. Further misrepresentations were made by Majhtenyi in late April or early May. These were elaborated by Maxwell and Majhtenyi at the hotel meeting in early May. There was the visit by Fleming and Banks in late May.[4] Finally, there were the meetings preceding the signature of the June 17 contract. Beyond this we see no reason why, for purposes of jurisdiction to impose a rule, making telephone calls and sending mail to the United States should not be deemed to constitute conduct within it. On what is now before us it is impossible to say that conduct in the United States was not "an essential link," Mills v. Electric Auto-Lite Co., 396 U.S. 375, 385, 90 S.Ct. 616, 24 L. Ed.2d 593 (1970), in leading Leasco into the contract of June 17, 1969. And that contract, signed in the United States, was "an essential link" in inducing Leasco to make the open-market purchases, whether these were triggered by a call from London to New York, as Leasco contends, or by a conversation in England, as defendants assert. Putting the matter in another way, if defendants' fraudulent acts in the United States significantly whetted Leasco's interest in acquiring Pergamon shares, it would be immaterial, from the standpoint of foreign relations law, that the damage resulted, not from the contract whose execution Maxwell procured in this country, but from interrelated action which he induced in England or, for that matter, which Leasco took there on its own. As said in a leading English case, "In order to establish a coherent chain of causation it is not necessary that the precise details leading up to the accident [here the loss] should have been reasonably foreseeable," Hughes v. Lord Advocate, [1963] A.C. 837, 852. We have approved this with the qualification, doubtless intended, that the damage was within the area where the defendant had unlawfully created a risk of loss. In re Kinsman Transit Co., 338 F. 2d 708, 721–726 (2 Cir. 1964), cert. denied, 380 U.S. 944, 85 S.Ct. 1026, 13 L. Ed.2d 963 (1968). See also Hart and Honoré, Causation in the Law 234–48 (1959).

■ Up to this point we have established only that, because of the extensive acts alleged to have been performed in the United States, considerations of foreign relations law do not preclude our reading § 10(b) as applicable here. The question remains whether we should. Appellants have three lines of defense: they claim (1) that § 10(b) has no application to transactions in foreign securities not on an organized American market; (2) that if it does, it has no application when such transactions occur outside the United States; and (3) that in any event it can have no application when the purchaser is not a citizen of the United States. Before considering these arguments, it will be well to review the relationship of the anti-fraud sections to other provisions of the federal securities laws.

The first such provision to be enacted was § 17(a) of the Securities Act of 1933. We need not here consider the mooted question whether this gave rise to civil liabilities or authorized only injunctive and criminal enforcement. See 3 Loss, Securities Regulation 1781, 1784–87 (2d ed. 1961), and 6 Supp. at 3908–12 (1969). What is here significant is that in a statute primarily designed to require registration of securities offered for sale by issuers and underwriters unless the securities or the transactions were exempted, § 17(a) applied to all fraudulent offers or sales of securities in commerce or by the use of the mails—whether the securities were registered, unregistered, or exempted, and, so far as the language goes, whether of domestic or foreign issuers.

---

4. Fleming's visit in May does not appear in plaintiffs' answers to interrogatories, but is not contested by defendants and, indeed, appears in Fleming's own affidavit.

Congress returned to the securities field the next year with the Securities Exchange Act of 1934. Much of the Act is designed, as its title implies, to regulate the organized securities markets. But Congress included a broad anti-fraud provision, § 10(b), modeled on § 17(a) of the 1933 Act, and it is plain that "[t]here is nothing in the section itself which limits its scope to the organized markets," 3 Loss, Securities Regulation at 1467; in fact the language explicitly negates this. The cases have uniformly so held, see *id.* notes 82 and 83 and Supp. at 3612. The contrary argument, based on certain statements of the necessity for regulation of the exchanges in § 2 and excerpts from the legislative history, fails in view of the plain language of § 10(b), the compelling inference from § 17(a) of the 1933 Act, and more detailed analysis of the legislative history itself. In its original form, § 10(b) [then § 9(c)] did embrace only securities listed on a national securities exchange, and the words "or any

security not so registered" were added only in the conference.[5] Congress simply did not bother to alter the preamble to fit the Act's enlarged substantive scope. Statements of the purpose of the legislation prior to the change made in conference thus cannot be used to narrow the scope of what Congress so clearly said.

Since Congress thus meant § 10(b) to protect against fraud in the sale or purchase of securities whether or not these were traded on organized United States markets, we cannot perceive any reason why it should have wished to limit the protection to securities of American issuers. The New Yorker who is the object of fraudulent misrepresentations in New York is as much injured if the securities are of a mine in Saskatchewan as in Nevada. Defendants have pointed to nothing in the legislative history which would indicate an intention that the language of § 10(b) should be narrowed so as not to protect him.[6]

---

5. The legislative history of the Securities Exchange Act is helpfully summarized in 2 Loss, Securities Regulation 784, n. 2. The bill as passed by the House, 78 Cong. Rec. 8116–17, and by the Senate, 78 Cong. Rec. 8713, contains no reference to "any security not so registered." While the Conference Report, H.R.Rep.No.1838, 73 Cong., 2d Sess. (1934), contains no explanation of the change, the informed members of Congress could hardly have been ignorant of what the Conference Committee had wrought.

6. The briefs discuss at length two matters of legislative history which seem to us to be of little relevance and may as well be dealt with at this point.

Section 30(a) of the Securities Exchange Act makes it unlawful for any broker or dealer to use the mails or an instrumentality of commerce to effect a transaction in securities of American issuers on a foreign securities exchange "in contravention of such rules and regulations as the Commissioner may prescribe as necessary or appropriate in the public interest or for the protection of investors or to prevent the evasion of this title." Section 30(b) says that, "[T]he provisions of this title or of any rule or regulation thereunder shall not apply to any

person insofar as he transacts a business in securities" outside the United States unless he does so in contravention of rules and regulations promulgated by the Commissioner.

Defendants argue that this marked the limit of how far Congress wished to go with respect to transctions having a foreign aspect. The purpose of § 30(a) [then § 28], as explained by Thomas G. Corcoran, principal draftsman of the bill requiring registration and reporting by companies whose securities were listed on American stock exchanges, was to give the SEC a weapon with which to counter the threat, made by opponents of the bill, that its enactment would drive American securities to foreign exchanges. See Hearings on S.Res. 84, 56 and 97 before the Senate Committee on Banking and Currency, 73d Cong. 2d Sess., Part 15, 6569, 6578–79 (1934). It cannot fairly be read as restricting the scope of the anti-fraud provision, as that was broadened by the conference report. Section 30(b) clearly has no application here. See, as to all this, Schoenbaum v. Firstbrook, *supra*, 405 F.2d at 207–208; Roth v. Fund of Funds, Inc., 405 F.2d 421 (2 Cir. 1968), cert. denied, 394 U.S. 975, 89 S.Ct. 1469, 22 L.Ed.2d 754 (1965).

We likewise cannot see any sound reason for believing that, in a case like that just put, Congress would have wished protection to be withdrawn merely because the fraudulent promoter of the Saskatchewan mining security took the buyer's check back to Canada and mailed the certificate from there. In the somewhat different yet closely related context of choice of law, the mechnical test that, in determining the *locus delicti,* "The place of wrong is in the state where the last event necessary to make an actor liable for an alleged tort takes place," Restatement of the Conflict of Laws § 377 (1934), has given way, in the case of fraud and misrepresentation, to a more extensive and sophisticated analysis. See Restatement (Second) of the Conflict of Laws § 148 (1971).

Our case, however, is not the simple one thus hypothesized. In that instance not only the fraudulent misrepresentation but the issuance of the check and the receipt of the securities occurred in the United States, although the check was deposited and the security mailed in Canada. Here it was understood from the outset that all the transactions would be executed in England. Still we must ask ourselves whether, if Congress had thought about the point, it would not have wished to protect an American investor if a foreigner comes to the United States and fraudulently induces him to purchase foreign securities abroad—a purpose which its words can fairly be held to embrace. While, as earlier stated, we doubt that impact on an American company and its shareholders would suffice to make the statute applicable if the misconduct had occurred solely in England, we think it tips the scales in favor of applicability when substantial misrepresentations were made in the United States.

■ This brings us to appellants' third line of defense, namely, that the purchaser was not an American but a Netherlands Antilles corporation.

Before proceeding to the main thrust of this argument, two other points should be considered. Defendants contend that Leasco N.V. is a necessary party; they fear that unless it is joined as plaintiff, they might be exposed to a subsequent action, particularly if losses resulting from the purchase of the Pergamon shares should render Leasco N.V. insolvent. They also contend that, absent Leasco N.V., the complaint does not allege a fraud "in connection with the purchase or sale" of a security, within the familiar principle of Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2 Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), and that plaintiffs thus lack standing. These points are sufficiently answered by the agreement of plaintiffs' counsel in open court that Leasco N.V. will be joined as a plaintiff. We proceed on the basis of that stipulation.

Although we have already stated the principal facts relating to the involvement of Leasco N.V., a few more details may be pertinent. The instructions to Rothschild to proceed with the open-market purchases came from Leasco, and Rothschild began its purchases, on June

In 1964, on the urging of the SEC, Congress amended § 12 of the Securities Exchange Act to include certain issuers whose securities were not listed on American securities exchanges. As originally drafted, the amendment exempted foreign issuers who would otherwise be subject to the new requirements, subject to termination of the exemption by the Commission. S.Rep.No.379, 68th Cong. 1st Sess. 29–31 (1963). As a result of the House hearings, Hearings on H.R. 6789, 6793, S. 1642 Before a Subcommittee of the House Committee on Interstate and Foreign Commerce, 88th Cong. 1st and 2d Sess. pp. 1286–87 (1964), this was reversed, see § 12(g)(13), so that the statute applies unless the Commission exempts. Plaintiffs consider this piece of history to work in their favor. Apart from question as to the propriety of interpreting the intention of the 1934 Congress from legislation passed 30 years later, a legislative decision on the ambit of the registration and reporting requirements of the Securities Exchange Act casts little light on the desired scope of the anti-fraud provision.

20, 1969, for that company's account. The permission granted by the Bank of England to make open-market purchases of Pergamon shares also ran to Leasco. Just who decided that the cash should be supplied by Leasco N.V., and when this was decided, are not clear. The shares are held in the names of nominees who have voted them in accordance with the instructions of Leasco. Finally, a letter from Leasco's Vice President-Finance to the Secretary of Pergamon states:

> Leasco Data has an interest in 5,206,210 Ordinary Shares purchased through N. M. Rothschild & Sons. These shares are held on behalf of Leasco International N.V., a wholly owned subsidiary of Leasco Data Processing Equipment Corporation in the following nominee names
> . . . .

It seems quite arguable from all this that Leasco N.V. is holding the shares merely as trustee for Leasco, which has the beneficial interest and is bound to reimburse Leasco N.V. for the latter's expenditures. If that were so, defendants' contention that the true purchaser was a foreigner would be drained of force. But even if Leasco N.V. is the beneficial owner, it would be elevating form over substance to hold that this entails a conclusion that the purchases did not have a sufficient effect in the United States to make § 10(b) apply. Whether Leasco N.V. is merely a financial conduit, as plaintiffs assert, or was planned to conduct an active business, as some of the SEC filings indicate, it was wholly-owned and its debt securities were guaranteed by Leasco and were convertible with Leasco common stock. We see no need to enter into the debate whether, as defendants contend and plaintiffs deny, Leasco obtained substantial tax and other advantages through the incorporation of Leasco N.V. and the use of the latter to acquire the Pergamon shares. Whatever may be the rule where the defrauded American investor chooses, deliberately and unilaterally, to have the purchase consummated abroad by a foreigner, here the situation was quite different. The Maxwell group expressly agreed in its written contract that Leasco could "at its election" have the offer made "by a wholly-owned subsidiary of Leasco or a wholly-owned subsidiary of such subsidiary," "providing Leasco shall remain responsible for the due performance" of the obligation to acquire the shares. This clause specifically covered Leasco N.V., which was part and parcel of Leasco in every realistic sense. In acceding to this provision the defendants themselves recognized that Leasco, the United States company, remained at all times intimately involved in the transaction; the foreign entity was accepted by both sides as the *alter ego* of the American. The case is quite different from another hypothetical we posed at argument, namely, where a German and a Japanese businessman met in New York for convenience, and the latter fraudulently induced the former to make purchases of Japanese securities on the Tokyo Stock Exchange.

■ Before leaving subject-matter jurisdiction, we should say a word in answer to the defendants' argument that since choice of law principles would select the law of England as the rule governing liability, application of § 10(b) of the Securities Exchange Act would violate international law. *Cf.* Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1955). At first blush the contention that the courts of the forum transgress their jurisdiction if they apply the forum's own law when correct choice of law doctrines would require them to apply the law of another state as the normative principle would scarcely seem to warrant discussion, particularly in a case like this where the full faith and credit clause of the Constitution can have no application. However, the argument is more subtle. Defendants concede that a New York court or a federal court if diversity jurisdiction existed, seized of an action by plaintiffs for common law fraud, would not transgress international law if, after due consideration, it erroneously chose New York rather than English law; the

difficulty alleged to exist here is that a federal court will feel constrained to apply § 10(b) of the Securities Exchange Act rather than the law of England. We are not as certain as the defendants that, under the principles stated in § 148 of the Restatement of Conflicts Second, English law would necessarily govern an action in New York for common law fraud.[7] But if it would, the conclusion asserted by defendants would not follow. For, as we have already demonstrated, in the circumstances described in § 17 of the Restatement of Foreign Relations Law, under which this case fits, the nation where the conduct has occurred has jurisdiction to displace foreign law and to direct its courts to apply its own.

We therefore hold that the motions to dismiss for lack of subject matter jurisdiction were properly denied.

7. Professor Ehrenzweig contends that "no 'conflicts' case [of fraud] can be found in which the court would have decided differently had all elements of the case been entirely domestic" and that the rule "is this simple: the court in a fraud case involving foreign elements will apply its own law." Conflict of Laws 558–59 (1962).

8. With one exception, none of the appellants disputes the manner of service of process, as distinguished from the adequacy of the basis for exercise of jurisdiction *in personam*. Defendants Kerman and Maxwell appear to have been served personally pursuant to both F.R.Civ.P. 4(i)(1) and N.Y.C.P.L.R. § 313. Defendant Chalmers, Impey appears to have been served in England pursuant to F.R. Civ.P. 4(i)(1) and N.Y.C.P.L.R. §§ 311, 313. Defendant Fleming Ltd. raises the point that process was served upon a director in New York and thus it was not served where "it is found" within the meaning of § 27 of the Securities Exchange Act. However, F.R.Civ.P. 4(e), states, *inter alia*, that whenever a statute or rule of court of the state in which the district court is held provides for service of summons upon a party not an inhabitant or found within the state, service in a federal action may be made in that manner, and N.Y.C.P.L.R. § 311 subd. 1 authorizes service to be made upon a corporation by serving a director.

## III. *Jurisdiction over the Person*

Jurisdiction over the person is challenged, thus far unsuccessfully, by defendants Fleming Ltd., and Chalmers, Impey & Co. and, thus far successfully, by defendant Kerman.[8] Plaintiffs assert personal jurisdiction on the basis of § 27 of the Securities Exchange Act. Alternatively they claim personal jurisdiction with respect to Fleming Ltd. under New York CPLR 301 and 302(a)(1) and (2) with respect to Kerman under New York CPLR 302(a)(1) and (3).[9] Since we hold that Congress meant § 27 to extend personal jurisdiction to the full reach permitted by the due process clause, it is unnecessary to discuss the applicability of the New York statutes, which could reach no further.

9. N.Y.C.P.L.R. (McKinney 1972):
 "§ 301. Jurisdiction over persons, property or status.
 A court may exercise such jurisdiction over persons, property, or status as might have been exercised heretofore.
 § 302. Personal jurisdiction by acts of non-domiciliaries.
 (a) Acts which are the basis of jurisdiction. As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nondomiciliary, or his executor or administrator, who in person or through an agent:
 1. transacts any business within the state; or
 2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or
 3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he
 (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
 (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; . . . ."

So far as here pertinent, § 27 provides:

> The district courts of the United States, the Supreme Court of the District of Columbia, and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this title or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this title or the rules and regulations thereunder. Any criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred. Any suit or action to enforce any liability or duty created by this title or rules and regulations thereunder, or to enjoin any violation of such title or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found.

The second sentence and the first portion of the third deal with venue; the last portion of the third speaks expressly only to service of process.[10] See United States v. Scophony Corp., 333 U.S. 795, 68 S.Ct. 855, 92 L.Ed. 1091 (1948); Arrowsmith v. United Press International, 320 F.2d 219, 227–228 (2 Cir. 1963). While Congress was doubtless thinking mainly in terms of exercising its power "to provide that the process of every District Court shall run into every part of the United States," Robertson v. Railroad Labor Board, 268 U.S. 619, 622, 45 S.Ct. 621, 622, 69 L.Ed. 1119 (1925), use of the word "wherever", rather than "where" or "in which", demonstrates an intention to authorize service on a defendant who can be "found" only in a foreign country, and although the section does not deal specifically with *in personam* jurisdiction, it is reasonable to infer that Congress meant to assert personal jurisdiction over foreigners not present in the United States to but, of course, not beyond the bounds permitted by the due process clause of the Fifth Amendment. See SEC v. Briggs, 234 F.Supp. 618 (N.D. Ohio 1964); Ferriaoli v. Cantor, 259 F. Supp. 842, 847–848 (S.D.N.Y.1966); see also Smit, International Aspects of Federal Civil Procedure, 61 Colum.L.Rev. 1031, 1039 n. 45 (1961).

█ The Supreme Court's latest relevant expression on the subject is the statement in Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958), that where the defendant is not personally present and there is no other demonstrable basis for jurisdiction, it is "essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Amplifying this, the Restatement (Second) of Conflict of Laws, § 27, lists various bases for the exercise of judicial jurisdiction over an individual who is not present. Those relevant here are doing business in the state, § 35; doing an act in the state, § 36; and causing an effect in the state by an act done elsewhere, § 37. These principles apply likewise to corporations, §§ 47, 49, 50. All this reflects the modern notions that where a defendant has acted within a state or sufficiently caused consequences there, he may fairly be subjected to its judicial jurisdiction even though he cannot be served with process in the state, and that the principal function of service of process is rather to give notice and opportunity to be heard, which can be done by appropriate methods of service outside the state. See McGee v. Interna-

---

10. This rather ineptly worded provision and the similar one in § 22(a) of the 1933 Act appear to have been modeled on § 12 of the Clayton Act. The venue portion goes back to § 11 of the Judiciary Act of 1789, 1 Stat. 79.

tional Life Ins. Co., 355 U.S. 220, 78 S. Ct. 199, 2 L.Ed.2d 223 (1957).

### Fleming Ltd.

 In light of these principles we have little difficulty in upholding the denial of the motion of Fleming Ltd. to dismiss for lack of personal jurisdiction. Richard Fleming, its managing director, and Lawrence Banks, first with him and then representing him, appeared at meetings in the United States and allegedly made misrepresentations concerning the value of Pergamon and the accuracy of the Whinney Murray & Co. report which Fleming Ltd. had commissioned. We thus do not reach the question whether Fleming Ltd. could be considered to be "doing business" in the United States by virtue of the activities of its New York subsidiary in buying and selling securities in the American markets and furnishing other services to Fleming Ltd.

### Chalmers, Impey & Co.

 We come to an opposite conclusion with respect to Chalmers, Impey & Co. ("Chalmers"). Plaintiffs' attempt to show that Chalmers was doing business in the United States in the spring of 1969 completely failed. All that was shown was that in October 1965 two partners of Chalmers and certain partners and employees of an American accounting firm, Hurdman and Cranstoun, formed a partnership to carry on, under the Chalmers' name, "specific engagements introduced to the U.S.A. partners by the United Kingdom partners." The only matter ever handled by this partnership related to the 1965 statements of Pergamon Press, Inc., but the audit was never completed. The partnership then became dormant. There is no suggestion that plaintiffs' claim arose from these minuscule activities three years before their encounters with Maxwell, and it is immaterial that the partnership was not formally dissolved until after the conduct here in question occurred and the amended complaint was filed. It is equally clear that Chalmers has done no act within the United States giving rise to the present cause of action.

This leaves only the ground elaborated in § 37 of the Restatement (Second) of Conflict of Laws:

> A state has the power to exercise judicial jurisdiction over an individual who causes effects in the state by an act done elsewhere with respect to any cause of action arising from these effects unless the nature of the effects and of the individual's relationship to the state makes the exercise of such jurisdiction unreasonable.

The classic illustration is the man who shoots a bullet across a state boundary; a more realistic example is furnished by McGee v. International Life Ins. Co., *supra*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed. 2d 223 (soliciting purchase of insurance policy and sending premium notices by mail from outside the state into the state). But this is a principle that must be applied with caution, particularly in an international context. See Duple Motor Bodies, Ltd. v. Hollingsworth, 417 F.2d 231, 239 (9 Cir. 1969) (dissenting opinion); Von Mehren & Trautman, Jurisdiction to Adjudicate: A Suggested Analysis, 79 Harv.L.Rev. 1121, 1127 (1966). At minimum the conduct must meet the tests laid down in § 18 of the Restatement (Second) of Foreign Relations Law, including the important requirement that the effect "occurs as a direct and foreseeable result of the conduct outside the territory." We believe, moreover, that attaining the rather low floor of foreseeability necessary to support a finding of tort liability is not enough to support *in personam* jurisdiction. The person sought to be charged must know, or have good reason to know, that his conduct will have effects in the state seeking to assert jurisdiction over him.[11]

---

11. Particularly in the area of manufacturers' liability for defective products, courts have been careful to distinguish the test for liability in tort from that for per-

The amended complaint does charge that Chalmers "knew or had good reason to know" that the allegedly false and misleading financial reports it had prepared "would be given by the defendants to plaintiffs as prospective purchasers of Pergamon and that plaintiffs would receive them and rely upon them." But the affidavit of John Ralph Briggs, the Chalmers partner who was in charge of the firm's work on Pergamon, broadly denies this. He avers that his first knowledge of negotiations between Leasco and Maxwell for the purchase of Pergamon shares came on June 18 when he saw a placard on a London newspaper stand "Maxwell in £25,000,000 Deal." The only contacts with Leasco consisted in his attending a social luncheon the next day, after the annual general meeting of Pergamon, and his making documents and other information available to a firm of accountants retained by Leasco, pursuant to a request made on July 14. By that date the bulk of the purchases on the London Stock Exchange had been made, and there is nothing to indicate that any false statements by Chalmers in the papers submitted to Leasco's accountants caused the purchases subsequent to July 14. Leasco did not dispute Briggs' assertions; it relied simply on the fact that Chalmers must have known that its reports on Pergamon would be relied on by anyone interested in buying Pergamon shares. On

that basis accountants operating solely in London could be subjected to personal jurisdiction in any country whose citizen had purchased stock of a company they had audited; the same would be true, of course, of accountants operating solely in the United States. Although such worldwide reliance may be, in a sense, foreseeable, it is not sufficiently so to constitute a basis of personal jurisdiction consonant with due process. See discussion in footnote 11 *supra*. Chalmers' motion to dismiss for lack of personal jurisdiction should have been granted.

### Isidore Kerman

The issue with respect to Kerman is closer than either of those previously discussed. As stated above, he was a director of Pergamon and the firm in which he is a senior partner acted as its solicitors, although he states that his partner DiBiase was "generally responsible for handling commercial matters" for it. Admittedly he attended the London meetings over four days in early June, 1969. His affidavit minimized his participation, saying that he attended because he "was a Director of the Company, as well as one of its solicitors and as such was keeping informed of developments of significance to the company and its stockholders." An opposing affidavit by a Leasco officer alleged that Kerman "took an active part" in the

sonal jurisdiction. Although no case has required a tortfeasor to be specifically aware that his product might cause injury in the very state seeking to subject him to suit, it is clear that activity in interstate commerce must be sufficiently extensive and regular to make this possibility a foreseeable risk of the business. *Compare* Eyerly Aircraft v. Killian, 414 F.2d 591, 596–597 (5 Cir. 1969); Duple Motor Bodies, Ltd. v. Hollingsworth, 417 F.2d 231, 235 (9 Cir. 1969) (jurisdiction found consonant with due process), *with* Uppgren v. Executive Aviation Services, Inc., 304 F.Supp. 165 (D.Minn.1969) (injury within state "merely fortuitous;" no jurisdiction). See, for similar discussion of jurisdiction in other areas of the law, Southern Machine Co. v. Mohasco Indus. Inc., 401

F.2d 374 (6 Cir. 1968) (breach of licensing agreement); Buckley v. N. Y. Post Corp., 373 F.2d 175, 181 (2 Cir. 1967) (defamation). Moreover, in an analogous area this court has reasoned that the commercial loss suffered by a business from acts committed elsewhere is itself fortuitous, since the place of impact is ruled by the injured party's choice of place of doing business rather than the locus of activity directly traceable to the defendant. Friedr. Zoellner (New York) Corp. v. Tex Metals Co., 396 F.2d 300, 303 (2d Cir. 1968); American Eutectic Welding Alloys Sales Co. v. Dytron Alloys Corp., 439 F.2d 428, 433 (2 Cir. 1971) (commercial loss not "injury within the state" within the meaning of N.Y.C.P.L.R. § 302(a)(3).

meetings and remained silent when, to his knowledge, Maxwell was misrepresenting the facts. Other Leasco officers averred that in the New York negotiations DiBiase did not act simply as a draftsman but "made numerous false and misleading statements to plaintiffs as to the operations and financial condition of Pergamon and its affiliated companies." Steinberg averred "upon information and belief," the source of which was undisclosed, that "Maxwell and DiBiase received from and sent to Kerman many communications respecting the terms of the June 17th Agreement." Kerman responded that there had been no such communications. DiBiase did not submit an affidavit, and Maxwell's affidavit neither mentions nor denies communication with Kerman. On the other hand, Leasco apparently made no effort to subpoena the telephone company or other records that would show whether transatlantic telephone calls were made. Leasco averred that, in addition to his position as director and solicitor, Kerman had an interest as owner of 60,000 Pergamon shares and trustee of Maxwell family trusts owning 600,000 shares, some or all of which may have figured in the purchases on the London Stock Exchange. Kerman denied he was a trustee of any Maxwell family trusts holding Pergamon shares or had any connection with sales by any such trusts; he said nothing with respect to the sale of the 60,000 shares. Leasco urged that if Judge Lasker was not prepared to deny Kerman's motion to dismiss, he should postpone decision until Kerman had answered interrogatories which Leasco intended shortly to serve upon him.

 Kerman's conduct in England differs from that of Chalmers (except for the two insignificant episodes after June 18) in that he was at all times well aware that Maxwell was endeavoring to sell Pergamon shares to Leasco. On the other hand, Leasco did not allege that Kerman himself made any misrepresentations; his offense, if offense it was, lay in remaining silent while Maxwell did. Kerman's case may differ also from Chalmers' with respect to his performing acts in the United States. To be sure, the rule in this circuit is that the mere presence of one conspirator, such as Maxwell, does not confer personal jurisdiction over another alleged conspirator. Bertha Building Corp. v. National Theatres Corp., 248 F.2d 833, 836 (2 Cir. 1957), cert. denied, 356 U.S. 936, 78 S.Ct. 777, 2 L.Ed.2d 811 (1958); H. L. Moore Drug Exchange, Inc. v. Smith, Kline & French Laboratories, 384 F.2d 97 (2 Cir. 1967). Neither would the partnership relation between Kerman and DiBiase alone justify a conclusion that DiBiase's acts in New York were the equivalent, for purposes of personal jurisdiction, of acts by Kerman here—as would be apparent if Leasco sought to assert such jurisdiction over other members of the firm. However, the matter could be viewed differently when the relationship was the closer one between a senior partner, especially one who is a director of the client, and a younger partner to whom he has delegated the duty of carrying out an assignment over which the senior retains general supervision. The case for doing this would be materially strengthened by proof that the junior was in frequent communication with the senior.

 There were too many unresolved questions of fact to make it proper for the judge to take the important step of dismissing Kerman as a defendant on the basis of the conflicting affidavits before him. Although plaintiffs may have been dilatory in not sooner propounding interrogatories, the burden of answering these would have been slight, and delay was scarcely a factor in an action that could not come to trial for many months. While Kerman's answers to interrogatories may do little to advance plaintiffs' case, plaintiffs are at least entitled to have them answered, see 4A Moore, Federal Practice ¶ 30.52[5] (1972 ed.), and to have the issue of personal jurisdiction

decided in accordance with the principles stated in this opinion.[12]

## IV. *Forum Non Conveniens*

█ Judge Ryan did not explicitly rule on defendants' motions to dismiss on the ground of *forum non conveniens,* nor include this issue among the questions certified pursuant to 28 U.S.C. § 1292(b). Defendants' request that we mandamus him to certify the issue meets an insurmountable obstacle. Congress plainly intended that an appeal under § 1292(b) should lie only when the district court and the court of appeals agreed on its propriety. It would wholly frustrate this scheme if the court of appeals could coerce decision by the district judge. D'Ippolito v. Cities Service Co., 374 F.2d 643, 649 (2 Cir. 1967); see 9 Moore, Federal Practice § 110.-22[3].

However, this does not mean that we could not mandamus the district judge to dismiss the action on the ground of *forum non conveniens,* Thomson v. Palmieri, 355 F.2d 64 (2 Cir. 1966), if we thought that course appropriate. While technically this matter may not be before us, since defendants have not filed a formal petition for mandamus with respect to the failure to dismiss for *forum non conveniens,* the parties have briefed and argued the issue on its merits, and we think it best to dispose of it now.

█ Despite plaintiffs' contrary arguments, there is little doubt that, viewed simply as a matter of trial convenience and apart from plaintiffs' desire to have whatever advantages may come from Rule 10b–5, which an English court might not apply, the balance of convenience would favor a trial in England. But that is not enough to justify a district court in dismissing the com-plaint of an American citizen, much less to warrant an appellate court's requiring it to do so. The Fifth Circuit said, in Burt v. Isthmus Development Co., 218 F.2d 353, 357, cert. denied, 349 U.S. 922, 75 S.Ct. 661; 99 L.Ed. 1254 (1955), that "courts should require positive evidence of unusually extreme circumstances, and should be thoroughly convinced that material injustice is manifest before exercising any such discretion to deny a citizen access to the courts of this country." We approved that formulation in Vanity Fair Mills, Inc. v. T. Eaton Co., *supra,* 234 F.2d at 645–646. See to the same effect Mobil Tankers Co., S.A. v. Mene Grande Oil Co., 363 F.2d 611, 614 (3d Cir.), cert. denied 385 U.S. 945, 87 S.Ct. 318, 17 L.Ed.2d 225 (1966). Defendants' claims of inconvenience from trial in New York do not measure up to the standards thus required.

\* \* \* \* \* \*

The orders of Judge Ryan denying the motions to dismiss for lack of subject matter jurisdiction and for lack of personal jurisdiction over Fleming Ltd. are affirmed. His order denying the motion of Chalmers to dismiss for lack of personal jurisdiction is reversed, with instructions to enter an order of dismissal. The order of Judge Lasker dismissing the complaint against Kerman is vacated and the cause remanded for further proceedings consistent with this opinion. The suggestion for the issuance of mandamus directing the district court to dismiss the complaint on the ground of *forum non conveniens* is declined. The stay of discovery with respect to Fleming Ltd. is vacated. Discovery with respect to Chalmers must now proceed as against a non-party.

Plaintiffs may recover costs against all defendants except Chalmers, which may recover its costs against plaintiffs.

---

12. Plaintiffs should also be allowed to take the depositions of DiBiase and Maxwell, on points relevant to personal jurisdic-tion over Kerman, upon written questions if they so desire and to offer oral evidence on the subject.