Isabel RECAMAN and Maria del Socorro Lopez, Plaintiffs, on their own behalf and on behalf of other members of the class

v.

Keith BARISH et al., Defendants.

No. 73–1092.

United States District Court, E. D. Pennsylvania.

Dec. 11, 1975.

Mark Braverman, Stassen, Kostos & Mason, Philadelphia, Pa., for plaintiffs.

Harvey S. Kronfeld, Mesirov, Gelman, Jaffe & Levin, Philadelphia, Pa., and Barry H. Garfinkel, Skadden, Arps, Slate, Meagher & Flom, New York City, for Keith Barish Amprop.

Jerome J. Shestack, Ira P. Tiger, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., and Alvin K. Hellerstein, Stroock & Stroock & Lavan, New York City, for Gramco Management, Ltd., Gramco Finance Co., Ltd., James O'Brien, Joseph Jordan and Ricardo Nunez.

Perry S. Bechtle, Cohen, Shapiro, Polisher, Schiekman and Cohen, Philadelphia, Pa., for U.S.I.F. Real Estate.

Mark H. Plafker, John O. J. Shellenberger, III, Stradley, Ronon, Stevens & Young, Philadelphia, Pa., for Trust Corp. of Bahamas Ltd.

John H. Lewis, Jr., Thomas M. Kittredge, Morgan, Lewis & Bockius, Philadelphia, Pa., for Park B. Dilks, Jr.

Franklin Poul, Judith R. Cohn, Wolf, Block, Schorr and Solis-Cohen, Philadelphia, Pa., and Arthur M. Handler, Golenbock & Barell, New York City, for Arlen Realty & Development Corp., Arlen Bahamas (Management), Ltd., Arlen Realty Management, Inc., Imperial Ins. Agency, Inc., and Coral Limited.

Gilbert Stein, Leonard Dubin, Gilbert Newman, Blank, Rome, Klaus & Comisky, Philadelphia, Pa., for Public National Bank of Washington, D. C.

Paul D. Sulman, and Robert M. Taylor, Philadelphia, Pa., for Bank of Nova Scotia.

Patrick T. Ryan, Drinker, Biddle & Reath, Philadelphia, Pa., and Robert B. Fiske, Jr., Sheila T. McMeen, Davis, Polk & Wardwell, New York City, for Morgan Guaranty Trust Co.

John G. Harkins, Jr., Jeffrey Charles Hayes, Patricia L. Freeland, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for The Fidelity Bank.

John G. Harkins, Jr., Jeffery Charles Hayes, Patricia L. Freeland, Pepper, Hamilton & Scheetz, Philadelphia, Pa., and J. Donald McLeod, Dahlberg, Mallender & Gawne, Detroit, Mich., for Bank of the Commonwealth Union Commerce Bank.

John G. Harkins, Jr., Jeffery Charles Hayes, Patricia L. Freeland, Pepper, Hamilton & Scheetz, Philadelphia, Pa., and Peter J. Armstrong, Varnum, Riddering, Wierengo & Christenson, Grand Rapids, Mich., for First State Bank of Greenville.

John G. Harkins, Jr., Jeffery Charles Hayes, Patricia L. Freeland, Pepper, Hamilton & Scheetz, Philadelphia, Pa., and William D. Parsley, Snyder, Loomis, Ewert, Ederer & Parsley, Lansing, Mich., for Bank of Lansing.

John G. Harkins, Jr., Jeffery Charles Hayes, Patricia L. Freeland, Pepper, Hamilton & Scheetz, Philadelphia, Pa., and Richard Ford, Fischer, Franklin & Ford, Detroit, Mich., for Peoples Bank of Port Huron.

John G. Harkins, Jr., Philadelphia, Pa., and Ralph L. McAfee, Cravath, Swain & Moore, New York City, for Bank of Providence Limited.

John G. Harkins, Jr., Jeffery Charles Hayes, Patricia L. Freeland, Pepper, Hamilton & Scheetz, Philadelphia, Pa., and Bernard W. Nussbaum, Allan A.

Martin, Wachtell, Lipton, Rosen & Katz, New York City, for E. D. Sassoon Banking International Limited, W. M. Brandt's & Sons Co., Ltd.

John G. Harkins, Jr., Jeffery Charles Hayes, Patricia L. Freeland, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for Banco Fiduciario de Panama, S.A. (Panama Bank & Trust Co., Inc.).

John G. Harkins, Jr., Jeffery Charles Hayes, Patricia L. Freeland, Pepper, Hamilton & Scheetz, Philadelphia, Pa., and Stanley Oswald Anthony Isaacs, Isaacs, Johnson & Thompson, Nassau, Bahamas, for Lee Wah Bank Limited.

No appearances for: Gramco International, S.A., Banco Mercantil de Panama S.A., Rafael G. Navarro, Jacques S. Boral, Lewis M. Kaplan, Fred M. Oppenheimer and Pierre Salinger

## MEMORANDUM AND ORDER

### BRODERICK, District Judge.

Plaintiffs Recaman and Lopez, citizens of Columbia, South America, seek substantial compensatory and punitive damages in this action which was commenced on May 15, 1973 on behalf of themselves and all who purchased, for cash or on margin, shares of United States Investment Fund on or before October 7, 1960.[1] The gravamen of their complaint is that the prospectus and oral statements, pursuant to which the offers and sales were made, were false and misleading and violated Sections 5(a), (b) and (c) and 17(a) and (c) of the Securities Act of 1933 (15 U.S.C. § 77e), Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)), and SEC Rule 10b–5 promulgated thereunder. Jurisdiction, which is predicated on the existence of a federal question, is said to exist by virtue of Section 22 of the Securities Act of 1933 (15 U.S.C. § 77v) and Section 27 of the Securities Exchange Act of 1934 (15 U.S.C. § 78aa). The thirty-seven defend-

ants named in the complaint include individuals, domestic and foreign corporations and domestic and foreign banks.

Inasmuch as the plaintiffs brought this matter as a class action and named numerous defendants in their complaint, the Court determined that the procedures outlined in the Manual for Complex Litigation would be followed. Accordingly, in Pre-Trial Order No. 1, dated November 23, 1973, the Court directed all of the parties to file all of their preliminary motions addressed to the complaint at one time, with the parties joining in a single set of papers to the extent that their differing interests would permit. All other proceedings, including the class action determination, were stayed except upon further order of the Court.

In accordance with the Court's Pre-Trial Order, all defendants joined in one set of motion papers which raised the following four grounds for dismissal of the action pursuant to Rule 12(b) of the Federal Rules of Civil Procedure or for summary judgment pursuant to Rule 56: (1) lack of subject matter jurisdiction; (2) the doctrines of *res judicata*, comity, release, and collateral estoppel; (3) the doctrine of *forum non conveniens*; and (4) lack of standing. In addition, each defendant that had grounds for seeking dismissal of the action because of venue, personal jurisdiction or service of process deficiencies did so by separate motion. Several groups of defendants filed separate motions to dismiss the action on the ground that the facts alleged by the plaintiffs in their complaint do not support their claim under the securities acts. Because we hereby grant defendants' motion to dismiss on the ground that this Court lacks subject matter jurisdiction, we will not address the other grounds raised in these motions.

There is a substantial record before us upon which we rely in ruling on these

---

1. Earlier, the plaintiffs had filed in this Court a motion for a temporary restraining order, naming many of the same defendants, and seeking to restrain a judicial sale in Nassau, Bahama Islands, which was being held pursuant to the directives of the Supreme Court of the Bahama Islands. In an opinion and order dated February 16, 1974, C.A. No. 73–337, this Court denied the temporary relief sought. In view of the fact that no complaint had been filed, the Court dismissed the action without prejudice to the plaintiffs to file a complaint.

motions. This record includes, in addition to the complaint: briefs of the parties; affidavits and exhibits submitted on behalf of the defendants; an affidavit and accompanying exhibits filed by plaintiff Lopez; defendants' answers to two sets of interrogatories; and a transcript of the oral argument on these motions.

The story of the circumstances underlying this complicated action is difficult to relate because thus far there has been no trial and all the facts have not been determined. Yet the issue of subject matter jurisdiction depends, in part, on the facts alleged and the affidavits filed. At this point we feel that it is helpful to set forth a general statement of the factual background underlying this action.

## I.

United States Investment Funds ("USIF"), which originated under a Deed of Trust dated August 26, 1966, was organized under the laws of the Commonwealth of the Bahama Islands and operated under a license granted by its Ministry of Finance. A person desiring to invest in the trust could do so by purchasing a beneficial interest in terms of shares represented by investment program certificates. Under the Trust Deed, sales of such shares were not eligible for ownership by residents of the United States. This prohibition was stated in each prospectus (Plaintiff's Supplemental Exhibits, # 3, p. 29) and on every investment program certificate. (Defendants' Appendix, Volume 2, Exhibit F).

Trust Corporation of Bahamas Limited, ("TCB"), a Bahamian corporation whose offices are located in Nassau, was named in the Trust Deed as custodian trustee of the assets of the trust, and has served as custodian trustee, registrar, and transfer agent of USIF from 1966 to the present.

The purpose of USIF, as set forth in the Trust Deed and in the prospectus, was to invest its funds in United States real estate. Gramco Management Limited ("Gramco") a Bahamian corporation with its offices in Nassau, was named in the Trust Deed to serve as the manager of the trust. The Deed gave it responsibility to organize sales of interests in the trust. Gramco engaged in the sale of USIF shares to investors throughout the world. USIF's Deed of Trust and Investment Program Certificates prohibit sales to United States residents.

When investors like the plaintiffs wished to buy shares on margin in addition to those they purchased for cash, Gramco Finance Company Limited, ("Finance"), a Bahamian corporation with its offices in Nassau, would loan the necessary funds to such investors and would receive from them a promissory note and, as collateral for the loan, a pledge of USIF shares purchased by the investors. From time to time, Finance borrowed money from banks in different parts of the world, a number of whom are named as defendants in this action. To secure the loans made to it by these banks, Finance assigned (rehypothecated) to the banks various notes and pledge agreements of USIF investors held by Finance as collateral for Finance loans to such investors.

On two occasions in 1969 plaintiffs purchased shares of USIF. The first purchase was for cash and the second was a margin transaction. The facts and circumstances surrounding these purchases will be more fully discussed later in this opinion.

Gramco spawned a number of subsidiaries and affiliates, several of which were owned, controlled, and/or directed by several of the individual defendants. These corporations include American Properties Management Limited, Inc., a Florida corporation principally engaged in the acquisition and management of the fund's real estate in the United States; Amprop, Inc., a Florida corporation which assumed the functions of American Properties Management Limited, Inc. in February 1969; and Imperial Insurance Agency, a Florida corporation and wholly owned subsidiary of American Properties Management Limited, Inc., which handled the insurance for the

fund's real estate. Additionally, USIF owned approximately 140 United States subsidiary corporations.

A process of cash drain began to beset the trust in the latter part of 1970. There were substantially increased demands for redemption of shares, the cost of which were not offset by new investments. In addition, there were defaults in payments by margin investors who had borrowed from Finance, which in turn prevented Finance from making payments on its obligations to various banks. This triggered action by the banks to realize on the collateral rehypothecated to them by Finance. The banks thus made additional redemption requests as they sought to realize on their collateral. These developments caused the trust to face a liquidity crisis. Effective October 7, 1970, the managing trustee, pursuant to a power conferred upon it by the Deed of Trust, suspended redemptions of shares of the trust.

Shortly thereafter, TCB, as custodian trustee of the fund, initiated an action in the Supreme Court of the Bahama Islands (No. 790 of 1970). TCB instituted a second action against Gramco (No. 118 of 1971), to challenge its management fees. This action, later consolidated with Gramco's counter-claim (No. 447 of 1971) for fees withheld by TCB, was eventually compromised under a settlement agreement approved by the Bahamian Supreme Court. At about this time, efforts were begun to effect a reorganization of the trust as an alternative to a liquidation of its holdings. TCB retained experts to evaluate the assets of the trust and examine the advisability of liquidation or reorganization. Sufficient progress was made in terms of a plan of reorganization to enable amendments of the original petition filed by TCB in the Bahamian Court so as to bring before that court all questions concerning the reorganization plan.

After consideration of various proposals, an order dated January 28, 1972 was entered by the Bahamian Supreme Court confirming a plan of reorganization. In connection with that decree, and pursuant to an order of that Court, further procedures were established to permit margin investors who had defaulted on their loans from Finance either to reinstate their loans, agree to a judicial sale of their shares which would relieve them from any future liability on the loans or permit them to be heard separately as to the reasons why their shares should not be sold at a judicial sale.

The obligation which plaintiffs owed to Finance, as well as the USIF shares which they had pledged to Finance as collateral for their loan, had been assigned by Finance as collateral for a loan made to Finance by American International Bank of Nassau. That bank had then assigned over its rights in the collateral to Fidelity Bank here in Philadelphia. Since plaintiffs had defaulted on their margin loan from Finance, their collateral became subject to the procedures approved by the Bahamian Supreme Court, as outlined above. Plaintiffs did not appear in that court, although they and their counsel were given the opportunity to do so by summons; their shares were thereupon ordered sold to satisfy their loan.[2] It was at this stage that the present plaintiffs filed a petition in this Court seeking an injunction to restrain the sale judicially decreed by the Bahamian Supreme Court. In an opinion and order dated February 16, 1974, C.A. No. 73–337, the Court denied the injunction.

## II.

On the issue of subject matter jurisdiction, the plaintiffs are entitled to every favorable inference of fact. *Steele v. Bulova Watch Co.*, 344 U.S. 280, 284, 73 S.Ct. 252, 97 L.Ed. 252 (1952). Accordingly, we will briefly outline the

---

2. Based on these proceedings before the Bahamian Supreme Court the defendants have also asserted the doctrines of *res judicata* and collateral estoppel as a basis for their motions to dismiss this action. Since we have reached the conclusion that subject matter jurisdiction is lacking we have not considered the other issues raised by defendants.

allegations in a light most favorable to the plaintiffs. Plaintiffs allege that USIF"s prospectus and the oral statements made by their salesmen were false and misleading because they: (1) failed to adequately disclose the risks to investors; (2) created a facade of approval and protection of United States laws; (3) misrepresented the true measure of net asset value; (4) failed to disclose interrelationships between defendants and their affiliates which were created for the purpose of generating fees and commissions for the benefit of individual defendants; and (5) falsely represented unqualified redemption rights secured by the maintenance of liquidity reserves. Plaintiffs claim that defendant Keith Barish, a resident and citizen of the United States, and the other individual defendants acted in concert with him and the corporate defendants to induce and deceive plaintiffs and other members of the class into purchasing shares of USIF for the sole purpose of increasing the defendants' fees and commissions. Plaintiffs allege that the defendants falsely represented that the fund was one of constant growth, and that plaintiffs were subject to little or no risk. Furthermore, defendants allegedly created the false impression that the fund was protected by the stability of real estate in the United States. Plaintiffs also claim that many of the affiliated corporations were created solely to foster the deceptive scheme, particularly Gramco International, a Panamanian corporation which was allegedly formed to allow Barish and his associates to establish themselves in a jurisdiction where their interests and receipt of fees and commissions could be concealed. Because the margin purchases were financed by a number of banks, which are named as defendants, the plaintiffs claim that the banks facilitated and participated in the scheme to defraud USIF investors.

### III.

Subject matter jurisdiction exists here, if at all, on the basis of a federal question. Complete diversity of citizenship is absent and therefore cannot create jurisdiction. The plaintiffs contend that this Court's jurisdiction emanates from Section 27 of the Securities Exchange Act of 1934 (15 U.S.C. § 78aa) and Section 22 of the Securities Act of 1933 (15 U.S.C. § 77v). The language of each statute and the statutes' purpose in regulating securities dealings has led the courts to conclude that the jurisdictional reach of both acts is coextensive. *Bersch v. Drexel Firestone, Inc.*, 389 F.Supp. 446, 453 (S.D.N.Y.1974), *aff'd in part*, 519 F.2d 974 (2d Cir. 1975). The question here presented, however, is whether this securities transaction, which contains substantial foreign components, is encompassed within the jurisdictional provisions of these statutes.

It is clear that in spite of the usual presumption against extra-territorial application of legislation, the securities laws of the United States do reach conduct of various kinds occurring outside the United States. Their reach can extend, in some circumstances, to dealings in the securities of foreign issuers. *See Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326 (2d Cir. 1972); *United States v. Clark*, 359 F.Supp. 131 (S.D.N.Y.1973). The courts have limited the application of the securities acts to transactions with which the United States has a significant connection or interest. In assessing the connection between a particular transaction and the United States, two basic tests have been applied.

These tests were developed in two leading cases decided by the Second Circuit: *Schoenbaum v. Firstbrook*, 405 F.2d 200 (2d Cir. 1968), *modified* 405 F.2d 215 (2d Cir. 1968), *cert. den.* 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969) and *Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326 (2d Cir. 1972). The test first established by the Second Circuit was implicitly applied in *Schoenbaum*. Termed the "objective territorial principle", it is set forth in § 18 of the Restatement (Second) of Foreign Relations Law of

the United States (1965)[3] and extends jurisdiction to conduct which occurs outside a territory, but which has an impact within the territory. Under this test, the main consideration is the impact that the transaction has upon domestic investors or the domestic securities market. In *Schoenbaum,* an American shareholder in a Canadian corporation registered on the American Stock Exchange brought a derivative suit under the Securities Exchange Act of 1934 claiming damages resulting from fraudulent acts committed outside the United States with respect to the securities of that foreign country. The Court found jurisdiction because the securities were registered on an American exchange and the transactions in question were seen as being detrimental to the interests of American investors.

The second test was set forth by the Court in *Leasco.* It extends jurisdiction to include acts or omissions which occur within a territory's boundaries, even though the effect of such acts or omissions may be felt outside the territory. Sometimes referred to as the "subjective territorial principle", it is set forth in § 17 of the Restatement (Second) of Foreign Relations Law of the United States (1965).[4] To come within this jurisdictional test, significant conduct with respect to the alleged violations must occur within the United States. In *Leasco,* an American company brought suit under the Securities Exchange Act of 1934 seeking damages re-

sulting from the fraudulent sale of a British company, the stock of which was listed on the London Stock Exchange, but not on any American Exchange. The actual purchase of the securities occurred in England. The court focused on misrepresentations and meetings which occurred in the United States, although it acknowledged that the crucial misrepresentations may have occurred in England. It stated, at 468 F.2d 1334, that:

> Conduct within the territory alone would seem sufficient from the standpoint of *jurisdiction* to prescribe a rule. It follows that when, as here, there has been significant conduct within the territory, a statute cannot properly be held inapplicable simply on the ground that, absent the clearest language, Congress will not be assumed to have meant to go beyond the limits recognized by foreign relations. (emphasis in original).

However, in determining if jurisdiction over the subject matter existed, the Court did not confine its examination to the situs of the alleged fraudulent activities. Writing for a unanimous panel, Judge Friendly also looked at the effect of the wrongful actions on United States shareholders and companies:

> While, as earlier stated, we doubt that impact on an American company and its shareholders would suffice to make the statute applicable if the misconduct had occurred solely in England, we think it tips the scales in favor of

3. "§ 18. *Jurisdiction to Prescribe with Respect to Effect within Territory*

A state has jurisdiction to prescribe a rule of law attaching legal consequences to conduct that occurs outside its territory and causes an effect within its territory, if either

(a) the conduct and its effect are generally recognized as constituent elements of a crime or tort under the law of states that have reasonably developed legal systems, or

(b)(i) the conduct and its effect are constituent elements of activity to which the rule applies;

(ii) the effect within the territory is substantial;

(iii) it occurs as a direct and foreseeable result of the conduct outside the territory; and

(iv) the rule is not inconsistent with the principles of justice generally recognized by states that have reasonably developed legal systems."

4. "§ 17. *Jurisdiction to Prescribe with Respect to Conduct, Thing, Status, or Other Interest within Territory*

A state has jurisdiction to prescribe a rule of law

(a) attaching legal consequences to conduct that occurs within its territory, whether or not such consequences are determined by the effects of the conduct outside the territory, and

(b) relating to a thing located, or a status or other interest localized, in its territory."

applicability when substantial misrepresentations were made in the United States. 468 F.2d at 1337.

## IV.

Application of the tests enunciated in *Leasco* and *Schoenbaum* satisfies us, as

more fully explained below, that subject matter jurisdiction does not exist. We need not determine whether these tests are to be applied concurrently or alternatively or if they should be balanced, for we find that the activities that occurred in this case are insufficient to satisfy either test.[5]

5. The courts that have considered both *Leasco* and *Schoenbaum* have reached varying interpretations of the two tests. In *Seltzer v. Bank of Bermuda Ltd.,* 385 F.Supp. 415, 418 (S.D.N.Y.1974), the court specifically stated that both tests must be satisfied to find jurisdiction. "The Securities Exchange Act is applicable to securities transactions where (1) there is some significant connection in the violations [*sic*] with the United States, *and* (2) the effects of the violations are detrimental to American investors". (emphasis added). In *United States v. Clark,* 359 F.Supp. 131 (S.D.N.Y.1973) and *Selas of America (Nederland) N.V. v. Selas Corp. of America,* 365 F.Supp. 1382 (E.D.Pa. 1973), both courts appear to require that both tests be satisfied. In *Clark,* the court said: "If we consider the cumulative effect of *Schoenbaum* and *Leasco,* it would appear that § 10(b) of the 1934 Act, and § 17(a) of the 1933 Act, cover at least charges of fraudulent conduct in the United States resulting in sales of securities abroad which have a substantial detrimental effect upon the interests of American investors", 359 F.Supp. at 134; in *Selas,* our learned colleague, Judge Huyett, said: ". . . it is clear that sufficient conduct took place within the U.S. to allow applicability of § 10(b) beyond the U.S. *and* that the transaction in question has a significant impact on American securities markets". 365 F.Supp. at 1386. (emphasis added).

Judge Frankel in *Investment Properties Int'l, Ltd. v. I. O. S., Ltd.,* CCH Fed.Sec.L.Rep. [70–71 Decisions], ¶ 93,011 at 90,735 (S.D.N.Y. 1971), *aff'd without opinion* (2d Cir. 1971) (unreported) placed more emphasis on the "impact" test and said:

But although the behavior of a defendant, including its connection to the United States and to the domestic securities market and exchanges, is relevant in deciding whether an extraterritorial transaction comes within the jurisdiction of the Act, *the main consideration appears to be: does the transaction have some significant impact on the domestic securities market or on domestic investors, and is extraterritorial application therefore necessary to protect securities trading in the United States and/or American investors? If there is no such domestic impact from a substantially foreign transaction, United States courts have no reason to become involved,* and compelling reason *not* [emphasis in original] to become involved, in

the burdens of enforcement and the delicate problems of foreign relations and international economic policy that extraterritorial application may entail. (emphasis added).

The Court in *Travis v. Anthes Imperial Limited,* 473 F.2d 515, 524 (8th Cir. 1973), accorded more weight to the offense related conduct in the United States:

In our view, subject matter jurisdiction attaches whenever there has been significant conduct with respect to the alleged violations in the United States. And this is true even though the securities are foreign ones that had not been purchased on an American exchange. Thus, the essential issue is whether the defendants' conduct in the United States was of such significance to subject them to jurisdiction in the District Court. (citations omitted).

In *SEC v. Kasser,* 391 F.Supp. 1167 (D.N.J. 1975), *reaff'd* C.A. No. 74–90, filed November 17, 1975 (D.N.J.), it was unclear whether the court required fulfillment of both tests. In one part of its opinion the court said: ". . . Congress did not intend to confer jurisdiction on the federal courts over an essentially foreign transaction in American securities *unless* that transaction has an impact on domestic investors or securities markets. This Court agrees with that contention." 391 F.Supp. at 1175. Later the court said: "The existence of American defendants notwithstanding, this Court concludes that it was not the intent of Congress to include essentially foreign transactions such as these within the ambit of the federal antifraud legislation." 391 F.Supp. at 1177.

In *Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974, 993 (2d Cir. 1975), the court delineated several situations in which it appeared to conclude that the two tests could be applied alternatively:

We have thus concluded that the anti-fraud provisions of the federal securities laws:

(1) Apply to losses from sales of securities to Americans resident in the United States whether or not acts (or culpable failures to act) of material importance occurred in this country; and

(2) Apply to losses from sales of securities to Americans resident abroad if, but only if, acts (or culpable failures to act) of material importance in the United States have significantly contributed thereto; but

■ There are several ways to meet the requirement that the alleged fraud has some significant impact on the domestic securities market. This test could be satisfied if the securities were registered on a national securities exchange. This was the element in *Schoenbaum* that established impact and was considered to be a necessary factor in *Seltzer v. Bank of Bermuda Ltd.,* 385 F.Supp. 415 (S.D.N.Y.1974) and *Selas of America (Nederland) N.V. v. Selas Corp. of America,* 365 F.Supp. 1382 (E.D.Pa. 1973). *Cf. Roth v. Fund of Funds, Ltd.,* 405 F.2d 421 (2d Cir. 1968), *cert. denied* 394 U.S. 975, 89 S.Ct. 1469, 22 L.Ed.2d 754 (1969). In the case at bar, it is undisputed that the securities of USIF, a foreign investment trust organized under the laws of the Bahama Islands, were not permitted to be, and have never been, listed on a United States stock exchange or traded over the counter within the United States. In addition, the transactions in which plaintiffs purchased USIF interests were not executed on any domestic securities market or by an American broker, dealer, or underwriter. Thus, the plaintiffs in this regard do not satisfy the impact test.

Another part of the impact test examines the nationality of the defrauded investors.[6] Although it is not always necessary that the investors be citizens or residents of the United States,[7] the fact that there had been sales to United States citizens or residents has been given great weight by a number of courts deciding the question of subject matter jurisdiction. *See SEC v. United Financial Group, Inc.,*[8] 474 F.2d 354 (9th Cir. 1973); *Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974 (2d Cir. 1975); *Seltzer v. Bank of Bermuda Ltd.,* 385 F.Supp. 415 (S.D.N.Y.1974); *United States v. Clark,* 359 F.Supp. 131 (S.D.N.Y.1973). "It is beyond dispute that the principal objective [of the securities fraud legislation] is protection of *American* purchasers who are exposed to fraudulent offers of sales of securities in interstate commerce." [emphasis added]. *SEC v. Kasser,* 391 F.Supp. 1167, 1175 (D.N.J.1975), reaff'd, C.A. No. 74–90, filed November 17, 1975 (D.N.J.). *Cf., Leasco, supra.* Plaintiffs acknowledge that they were citizens of Columbia, South America at the time they purchased shares of USIF (March and October, 1969), but claim that at the time of purchase until the present they

(3) Do not apply to losses from sales of securities to foreigners outside the United States unless acts (or culpable failures to act) within the United States directly caused such losses.

**6.** In *IIT v. Vencap, Ltd.,* 519 F.2d 1001, 1016–17 (2d Cir. 1975) IIT, an international investment trust organized under the laws of Luxembourg, brought suit under the securities laws. In discussing subject matter jurisdiction, Judge Friendly said:

Taking the view most favorable to the plaintiffs, the 300 American fundholders were only a .2% of IIT's fundholders. Even assuming—although we have been cited no evidence to support this—that the United States holders had invested proportionately more than the foreigners, their investment would have represented only some .5% of the total.

. . . . the losses from this $3,000,000 investment to these 300 American investors, owning only some .5% of a foreign investment trust which reported net assets of $263,000,000 as of December 31, 1971, and the shares of which apparently were not in-

tended to be offered to American residents or citizens, is not the "substantial" effect within the territory of which the Restatement of Foreign Relations Law § 18(b)(ii) speaks. [Footnotes omitted].

**7.** *See Wandschneider v. Industrial Incomes, Inc. of North America,* CCH Fed.Sec.L.Rep. [71–72 Decisions] ¶ 93,422 (S.D.N.Y.1972); *Securities and Exchange Commission v. Gulf Intercontinental Finance Corp.,* 223 F.Supp. 987 (S.D.Fla.1963). Although the plaintiffs in *Wandschneider* were German nationals, the securities involved were those of an American corporation which was registered with the SEC as a broker dealer.

**8.** Plaintiffs allege that the structure and operation of the defendant corporations is similar to the pattern found to be a violation of the securities laws in *United Financial.* However, the parent corporation in that case, which was found to control the fraudulent scheme, was a Delaware corporation with its headquarters in California. This situation is markedly different from the present one, where the alleged "parent" is either Gramco International, S.A., a Panamanian corporation, or USIF, a Bahamian corporation.

have been residents of Florida. On the basis of the affidavits and exhibits in this record, we find that at the time of the purchases in 1969 the plaintiffs were neither citizens nor residents of the United States. In making this finding the Court has considered that: (1) USIF's Deed of Trust and Investment Program Certificates expressly prohibit sales to United States residents; (2) plaintiffs admit that their initial purchase of USIF shares in March, 1969 took place in Bogota, Columbia; (3) at the time of the second purchase, plaintiffs explicitly stated on their application for a margin transaction that they were residents of Bogota, Columbia; (4) the passport of plaintiff Recaman shows that prior to 1972 she was an occasional visitor to the United States holding only a "tourist visa"; and (5) the passport of plaintiff Lopez shows that at the time the shares were purchased in March and October, 1969 and during this entire period she has been an occasional visitor to the United States holding only a "tourist visa". Hence on the basis of citizenship and residence the plaintiffs fail to satisfy the impact test.[9]

Plaintiffs suggest another theory by which they can meet the impact test. They argue that since USIF made substantial investments in United States real estate, the activities of the defendants necessarily affected real estate type securities traded in the United States. In essence, plaintiffs argue that the antifraud provisions of the Securities Acts reflect Congress' intent to protect all types of investors in the United States and not merely investors in the organized securities markets.

An examination of the cases that have established or applied the impact test leads us to conclude that this theory is not applicable under the facts of this case. In *Schoenbaum*, where the test originated, the Court was concerned with giving extraterritorial application of the Securities Exchange Act " . . . in order to protect *domestic investors* who have purchased foreign securities on *American exchanges* and to protect *the domestic securities market* from the effects of improper foreign transactions in American securities." 405 F.2d at 206. (emphasis supplied). In *United States v. Clark*, 359 F.Supp. 131 (S.D.N.Y.1973), a securities fraud was charged in the indictment. The charges in the indictment were found to have a sufficient detrimental effect on the interests of American investors to establish the crime. The indictment charged that the purpose of the foreign issue (which was the subject of the fraud) was to have the proceeds available to the parent corporation (a United States corporation) in the form of unsecured loans. According to the indictment, the European offering was one part of a scheme to convey to the American public a false image about the soundness of the parent corporation, thus artificially inflating the market price of its stock. In addition, part of the securities sold in Europe were warrants for the purchase of the stock of the parent corporation.[10]

**9.** Plaintiffs claim that the Ninth Circuit's holding in *SEC v. United Financial Group, Inc.*, 474 F.2d 354 (9th Cir. 1973) that subject matter jurisdiction existed even though only three of the thousands of investors were Americans indicates that American investors is a *de minimis* requirement. However, plaintiffs have failed to show that they fulfill even this *de minimis* test. TCB, USIF's custodian trustee, has stated in its answer to plaintiffs' first set of interrogatories that to the best of its knowledge no USIF purchaser was an American citizen or resident at the time of his purchase. The defendant banks have similarly stated in response to plaintiffs' first set of interrogatories that none of the investors whose shares were rehypothecated were residents or citizens

of the United States at the time of their purchase of USIF shares. USIF's Deed of Trust, prospectus and Investment Program Certificates all contain prohibitions against sales to Americans.

**10.** *See Selas, supra,* 365 F.Supp. at 1386, where the court held that the alleged transactions were sufficient to meet the impact test. The court found that the defendant was a publicly owned corporation whose stock was registered on the American Stock Exchange and the agreement whereby the stocks were transferred was made between an American corporation and employees of its wholly-owned foreign corporation (at least one of whom was alleged to be an American).

In *Bersch,* the district court gave credence to an expert's study which found that the failure of the stock offering had the effect of impairing foreign investor confidence in the American securities market and inhibiting sales of domestic securities. On this basis the district court concluded that the transaction possessed the requisite impact on the American securities market. Judge Friendly for the Second Circuit rejected the district court's analysis holding:

> . . . [W]e conclude that the generalized effects described by Professor Mendelson would not be sufficient to confer subject matter jurisdiction over a damage suit by a foreigner under the anti-fraud provisions of the securities laws.

> . . . there is subject matter jurisdiction of fraudulent acts relating to securities which are committed abroad only when these result in injury to purchasers or sellers of those securities in whom the United States has an interest, not where acts simply have an adverse affect on the American economy or American investors generally. [Footnotes omitted]. 519 F.2d at 988–9.

Similarly, in the case at bar no such direct connection between the alleged fraudulent transactions and the American securities market has been alleged. Plaintiffs' suggestion that the activities of the defendants affected real estate type securities in the United States lacks the further causal bridge to connect the real estate type securities with harm to the American securities market. *See* the statement of Judge Frankel in *Investment Properties Int'l., Ltd., v. I. O. S., Ltd.,* CCH Fed.Sec.L.Rep. [70–71 Decisions] ¶ 93,011 at 90,738 (S.D.N.Y.1971),

*aff'd without opinion* (2d Cir. 1971) (unreported), where he said: "That decisive factor in *Schoenbaum*—that 'this reduction in equity would be reflected in lower prices bid for the shares on the *domestic stock market*'—(emphasis added) —is precisely what IPI cannot show. As already noted, its shares are not sold in the domestic securities market, and the domestic injury found in *Schoenbaum* does not exist here." In the instant case, the same deficiency noted by Judge Frankel exists with respect to USIF. Plaintiffs cannot show an impact on the United States securities market by reference to the real estate holdings of USIF, particularly where the securities of the corporations through which USIF holds the real estate are not traded on any domestic securities markets.[11]

Plaintiffs' last argument is that the American "elements" of this transaction are sufficient to create the requisite impact. In this connection, they point to such factors as: the American citizenship of some of the owners or directors of Gramco and its subsidiary corporations; the financing of some margin purchases by United states banks; and the fact that payment for USIF shares was required to be in dollars. In our view, however, these contacts, like the others relied upon by plaintiffs, are insufficient to demonstrate an impact upon American investors or the domestic securities market. Plaintiffs have not, therefore, met the impact test.

■ The second test as discussed above considers the situs of the fraudulent acts. Plaintiffs' complaint focuses upon the false and misleading statements that were allegedly made by USIF's salesmen and found in the USIF prospectus. Our reading of the record convinces us that significant offense related conduct did not take place in the

---

11. Plaintiffs refer to 6 Securities and Exchange Commission, *Institutional Investor Study Report,* H.R.Doc. No. 92–64, 92nd Cong., 1st Sess. 152 (1971). This study found that the inadequate disclosure and conflicts of interest which are part of the operation of some offshore funds have eroded investor confidence in United States-based funds, and adversely affected the balance of payments in the United States. However, this study, like the plaintiffs' other allegations, does not sufficiently demonstrate the impact on domestic *securities* market and is similar to the study that was found to be insufficient to establish impact in *Bersch, supra.*

United States. Plaintiffs' initial contact with USIF occurred in March, 1969, when salesmen from Gramco visited plaintiffs in Bogota, Colombia. The Gramco salesmen were United States residents. They explained the nature of the sales and gave the plaintiffs a prospectus and an application for purchase which they filled out. To complete the purchase, which was made in the names of both plaintiffs, who are sisters, plaintiff Lopez authorized the Gramco salesmen to make a withdrawal of her funds from her account in a bank in Miami, Florida. (Affidavit of Lopez, ¶s 3, 4 and 5, Defendants' Appendix, Vol. 2, # 10.)

Gramco salesmen offered additional shares of USIF to plaintiffs in Bogota, Colombia in October of 1969. Plaintiffs were encouraged to make a second investment so that they could participate in the margin sales program, which was explained to them at the Bogota meeting. The funds to be used in making the second purchase were also in Miami. Plaintiff Lopez then traveled to Miami with the Gramco salesmen and made the arrangements for transferring the funds. (Lopez Affidavit, ¶s 6 and 7).

Examining these transactions, we find that they fail to establish significant offense related conduct in the United States. Here we have residents and citizens of Bogota, Colombia purchasing shares in a Bahamian trust in Bogota from a United States resident who was acting as a salesman of shares in the Bahamian trust. At all times material the custodian trustee of the Bahamian trust, TCB, was a Bahamian corporation maintaining its offices in Nassau. The managing trustee, Gramco, through whom plaintiffs purchased their shares, was also a Bahamian corporation with its offices in Nassau. Furthermore, when plaintiffs desired to purchase additional USIF shares they did so through another

Bahamian corporation, Finance, which was also headquartered in the Bahamas. The plaintiffs, residents of Bogota, Colombia did not purchase their shares from a United States broker or pursuant to communications from the United States. Furthermore, there is no contention that USIF shares were ever traded on any United States securities exchange or over-the-counter market. The fact that the Gramco salesmen who allegedly made misrepresentations and showed a prospectus containing alleged misrepresentations were United States residents and the fact that plaintiff Lopez traveled to the United States to obtain her money to pay for her purchase does not establish significant offense related conduct in the United States.

Plaintiffs appear to place great reliance on *SEC v. Gulf Intercontinental Financial Corp.*, 223 F.Supp. 987 (S.D. Fla.1963), referring to it as a case "directly on point." We do not agree. *Gulf* was decided in 1963 prior to the development of the tests enunciated by *Schoenbaum* and *Leasco*. The court in *Gulf* found that the investments offered by the defendants were "extended to all parties [including United States investors] who might be interested." 223 F.Supp. at 994. In the case at bar the Deed of Trust and Investment Program Certificates expressly prevented residents of the United States from purchasing shares of the trust. But of equal importance is the fact that the district court in *Gulf* found the entire transaction to be a promotional scheme whereby the "true issuers" of the notes of Gulf Intercontinental, the Canadian company, were the individual and corporate Florida defendants and that Gulf Intercontinental was nothing more than a conduit for the securities issued by the Florida corporation.[12] Plaintiffs have not estab-

12. "Looking through the transparent fabric of this promotional scheme, it becomes obvious that the true issuers of the notes of the Canadian company were the Florida defendants both individual and corporate since the purpose of the Canadian company was to purchase the notes of the Gradskys and their control corporations in exchange for the monies which the Canadian corporation received from the public. Gulf Intercontinental was nothing more than a conduit for the securities caused to be issued by the Florida defendants." [Footnotes omitted]. 223 F.Supp. at 995.

lished such a basis for jurisdiction in the instant case.

The plaintiffs also claim that because USIF owned substantial real estate in the United States, that some directors of Gramco and other subsidiaries were United States citizens and residents, and that some American banks were used to finance margin sales, USIF is, in substance, a United States corporation. Once this premise is accepted, argue plaintiffs, any activity in the United States undertaken by any of the banks, any USIF subsidiary corporation, or any director is sufficient to establish jurisdiction.

This proposition cannot be sustained. In *Finch v. Marathon Securities Corporation*, 316 F.Supp. 1345 (S.D.N.Y.1970), a 10b–5 action, Judge Tenney granted defendants' motion to. dismiss a. complaint brought by a British plaintiff who alleged that he was fraudulently induced by foreign defendants to purchase shares of a British corporation owned by a Bermudian investment fund. All of the officers and six of the eight directors of the Bermudian investment fund were Americans; both the Bermudian company and the successor Delaware corporation were controlled by an Illinois corporation, and were registered with the SEC as investment companies and maintained offices in New York. The plaintiff purchaser and the representatives of defendant investment fund met in London to plan the transaction, then traveled together to New York to execute the . purchase agreement, pursuant to which the transfer of the securities took place (the agreement was subsequently revised and. reexecuted in London). Payment for the securities, which were kept in New York, was required to be made at defendants' principal office within the United States. The plaintiff in *Finch* unsuccessfully .argued that these contacts with the United States constituted significant offense related conduct in the United States. Judge Tenney disagreed, holding that the significant offense related conduct occurréd outside of the United States; that the collateral New York conduct relating to the sale of the securities and the other insignificant United States contacts did not transform the purchase into a United States transaction; and that, in any event, plaintiff had not met the first test of showing impact on a domestic securities market. The Court held:

" . . . [W]hen, as here: (1) the substance of the alleged fraudulent conduct occurred outside of the United States; (2) the parties are predominantly foreign; (3) the subject shares are securities in a foreign corporation neither registered nor traded on a national securities exchange; and (4) there is no showing of any domestic injury, it would appear that the district court is without subject matter jurisdiction, *despite the existence of other less meaningful American-based facts and events.*" 316 F.Supp. at 1349. (Emphasis added).

Similarly, in *SEC v. Kasser*, 391 F.Supp. 1167 (D.N.J.1975), *reaff'd*, C.A. No. 74–90, filed Nov. 17, 1975 (D.N.J.), the court granted defendants' motion to dismiss for lack of subject matter jurisdiction. The complaint alleged that the defendant Kasser, a United States citizen, and other United States citizens, fraudulently induced the Manitoba Development Fund, an organization created by the Canadian government of Manitoba to oversee the development and financing of a forestry complex in Manitoba, to enter into an investment contract with defendant: Churchill Forest Industries (Manitoba) Ltd., a Canadian corporation allegedly controlled by Kasser. The complaint alleged a number of other fraudulent acts allegedly undertaken by the individual and corporate defendants, the latter of which were primarily United States corporations, in connection with the execution and implementation of this investment contract. Despite the fact that a number of activities took place in the United States, Chief Judge Whipple held that the transaction was essentially a foreign one that would not

support subject matter jurisdiction in the United States.[13]

The facts and events present in the case at bar are no more significant that those found insufficient to support the court's jurisdiction in *Finch* and *Kasser*. In both cases, the courts rejected the plaintiffs' theories that the citizenship of the individual defendants or the corporate defendants' officers and other collateral contacts with the United States could serve to impute United States control over the transactions. Likewise, the United States citizenship of some of the officers and directors of Gramco and the fact that some subsidiaries were United States corporations does not permit this Court to apply United States securities laws to the alleged illegal transactions in this case.[14]

For all of the above reasons, will grant the motion of defendants to dismiss this action on the ground that this Court lacks subject matter jurisdiction.

---

**13.** In his second opinion in this case, *SEC v. Kasser*, C.A. No. 74–90, filed November 17, 1975 (D.N.J.), Chief Judge Whipple considered the decisions in *ITT v. Vencap, Ltd.*, 519 F.2d 1001 (2d Cir. 1975) and *Bersch, supra*, and reaffirmed his earlier decision. He referred with approval to the decision in *F. O. F. Proprietary Funds, Ltd. v. Arthur Young & Co.*, 400 F.Supp. 1219, filed September 24, 1975 (S.D.N.Y.), in which the court dismissed for lack of subject matter jurisdiction an action in which many of the alleged fraudulent acts

took place in the United States and held that subject matter jurisdiction did not exist because the alleged fraudulent transaction was predominantly foreign.

**14.** *Compare* the activities of the defendants in the instant case with the activities held to establish sufficient offense related conduct in other cases: *United Financial*, 474 F.2d at 356–7; *Travis*, 473 F.2d at 524–6; *Leasco*, 468 F.2d at 1330–3; *Selas*, 365 F.Supp. at 1386.