SUN FIRST NATIONAL BANK OF ORLANDO, Plaintiff,

v.

Eldon MILLER, Gladys Miller, Shorterm International, Inc., Harry Nappi, William Allen, Shortloan International, Limited, Short Loan & Mortgage Company, Limited, London Security & Trustee Company, Limited, Norman Harrison Woolley, Norman Edward Woolley, Ian Burrell Haig Woolley, Robert Franklin Laidlaw, George Beedie Esselmont and Terrence Jackets, Defendants.

No. 75 Civ. 6517.

United States District Court,
S. D. New York.

Jan. 9, 1978.

Barrett, Smith, Schapiro, Simon & Armstrong, New York City, for plaintiff; Warren H. Colodner, Linda E. Laufer, New York City, of counsel.

Raymond F. Gregory, New York City, for defendants; Alfred V. Greco, New York City, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

*Facts*

This litigation arises out of a "repurchase agreement" entered into by Sun National Bank of Orlando ("Sun") and Financial Corporation ("Financial") on July 7, 1975, for which Shorterm International, Inc. ("STI") acted as the broker[1] for both Sun and Financial. The terms of the transaction obligated Financial to repurchase from Sun Bank on July 8, 1975, Treasury bills which had served as the collateral for the transaction at an aggregate purchase price of $40,028,861.11. This transaction represented (1) an extension of a July 3, 1975 agreement which had involved a repurchase arrangement of approximately $30,000,000; and (2) a supplementary arrangement whereby Sun purchased an additional $10,000,000 in Treasury bills at par value, subject to Financial's obligation to repurchase.

Financial defaulted on its obligations under the July 7th repurchase agreement and allegedly caused Sun to suffer a loss of $2,604,000.00 when Sun sold the Treasury bills on the open market. The essence of Sun's complaint is that at the time of both the July 3rd and the July 7th repurchase transactions, the defendants "knew or should have known" that the severe financial difficulties that Financial had been suffering for some time would prevent Financial from honoring its repurchase commitment to Sun, and that the defendants failed to apprise Sun of that risk. Sun asserts numerous federal and state causes of action including an action based upon Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j) and Rule 10b–5 promulgated thereunder (17 C.F.R. 240.10b–5).[2] Plaintiff also seeks to recover damages for STI's failure to register as a broker under the provisions of the Securities Exchange Act of 1934 (15 U.S.C. § 78*o*), and failure to register Financial's repurchase obligations pursuant to the registration provisions of the Securities Act of 1933 (15 U.S.C. §§ 77e, 77*l*).

Initially, the plaintiff sued Financial, Eldon and Gladys Miller (the owners and directors of Financial), STI, Harry Nappi (President of STI), and William Allen (STI's broker who allegedly solicited Sun Bank's participation in the repurchase transaction). After some discovery had occurred, however, plaintiff was permitted to amend its complaint to include the corporate defendants Shortloan International, Ltd. ("SLI"), Short Loan & Mortgage Company, Ltd. ("SLM"), and London Security & Trustee Company, Ltd. ("LS"), as well as the indi-

---

1. By the use of the term broker we do not imply that the court is now holding STI to be a "broker" within the meaning of 15 U.S.C. § 78c(a)(4) so as to require registration under § 15 of the Securities Exchange Act. 15 U.S.C. § 78(*o*). Rather, the term is used in a more generalized sense.

2. Counts 1 and 2 allege violations of § 10(b) of the 1934 Act, 15 U.S.C. § 78j (1970) and rule 10b–5 promulgated thereunder, 17 C.F.R. 240.-10b–5 (1977);

    Counts 3 and 4 allege violations of §§ 5, 12(1) and 12(2) of the 1933 Act. 15 U.S.C. §§ 77e, 77

*l*(1), 77*l*(2) (based on the failure to register Financial's repurchase obligations);

Counts 5 and 6 allege violations of New York's Martin Act, N.Y.G.B.L. §§ 352–359–h (McKinney 1968 & Supp. 1977);

Count 7 alleges negligence;

Count 8 alleges common law fraud;

Count 9 alleges violations of § 15 of the 1934 Act. 15 U.S.C. § 78*o* (1970) (violation of the broker-dealer registration requirements);

Count 10 alleges violation of the registration requirements of New York's Martin Act, supra; and

Count 11 alleges breach of contract.

vidual defendants Robert Franklin Laidlaw, Terrence Jackets, Norman Harrison Woolley, Norman Edward Woolley, and Ian Burrell Haig Woolley.[3] All of the additional defendants are located in England. Plaintiff admits that these English defendants themselves had no dealings with Sun, but justifies their status as parties defendant because of their responsibility for the wrongful actions of STI "not only by reason of their own actions and inactions, but also because they dominated and controlled [STI] as their alter ego and agent and are to be deemed 'controlling persons' of [STI]" within the meanings of Section 15 of the Securities Act of 1933 and Section 20(a) of the Securities Exchange Act of 1934.[4] The English defendants now move to dismiss pursuant to Rule 12(b), F.R.Civ.P., for lack of *in personam* jurisdiction.

*Parties*

The individual English defendants in this action were all members of STI's Board of Directors. They also were and continue to be directors and/or officers of one or more of the English defendant corporations— SLI, SLM and LS. Moreover, N. H. Woolley, N. E. Woolley, and Ian Woolley are major shareholders of STI's ultimate parent, LS.

The newly added corporate defendants in this action are, in fact, a column of related companies all dealing in various types of financial transactions. At the head of the column sits LS, an English holding company which has been characterized by plaintiff as the coordinator of the corporate group[5] and by defendants as being virtually inactive. Next in line is SLM, the 99% owned subsidiary of LS. SLM deals exclusively in sterling transactions on the European money markets. SLM, in turn, owns 99% of the outstanding shares of SLI. SLI is a money broker for Euro-currency transactions and

the direct parent and 100% owner of STI— the alleged primary perpetrator of the securities violations here at issue.

STI was created in 1973 as an outgrowth of an exploratory mission to the United States by N. E. Woolley and Terrence Jackets, on behalf of SLI, to seek a permanent arrangement with an American money broker as a means of expanding SLI's business in Euro-currency transactions. While in the United States, Jackets and Woolley met with Harry Nappi, an employee of an American brokerage firm, who suggested the formation of an American corporation to deal primarily in federal fund transactions. That suggestion was approved by SLI's board of directors and in the latter part of February, 1973, Robert Laidlaw and Jackets flew to New York to complete the arrangements for the creation of STI. Sometime after engaging in the actions which form the basis for the present litigation, STI discontinued operations and is now defunct. While in existence, STI dealt in federal fund, repurchase, and Euro-currency transactions.

*Discussion*

The case at bar raises numerous questions as to the extent to which a court can exercise *in personam* jurisdiction over foreign defendants via the provisions of the federal securities laws—§ 22 of the 1933 Act, 15 U.S.C. § 77v, and § 27 of the 1934 Act, 15 U.S.C. § 78aa. The jurisdictional reach of these statutes has been held to extend to the full limits of the due process clause. *Leasco Data Processing Equipment Corp. v. Maxwell,* 468 F.2d 1326, 1339–40 (2d Cir. 1972); *Bersch v. Drexel Firestone, Inc.,* 389 F.Supp. 446, 459 (S.D.N.Y.1974), *aff'd in relevant part,* 519 F.2d 974 (2d Cir.), *cert. denied,* 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975). Consequently the in-

---

**3.** George Esselmont was also a director of STI and a named defendant in this action, but the action has been discontinued with respect to him.

**4.** Plaintiff's memorandum of law in opposition at 5.

**5.** Plaintiff points out that LS' filing with the Companies Registry in London describes its main activity as "the co-ordination of the companies within the Group, those in the main being companies on banking, broking, discounting and fiscal agency." Colodner affidavit # 1 ¶ 11.

quiry here is whether the assertion of jurisdiction over the English individual and corporate defendants in this action would violate due process.[6]

In *Leasco Data Processing Equipment Corp. v. Maxwell, supra,* Judge Friendly provided the framework for analyzing the extent to which a court can constitutionally assert jurisdiction over a defendant under the federal securities laws. Judge Friendly stated that "it is 'essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" 468 F.2d at 1340, *quoting Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). In giving form to this principle, *Leasco* cited with approval the various provisions of the Restatement (Second) of Conflict of Laws which provide for the assertion of jurisdiction based on the defendant's doing business within the state, § 35; doing an act within the state, § 36; and causing an effect within the state by an act done elsewhere, § 37. These principles apply similarly to corporations, §§ 47, 49 & 50. Judge Friendly cautioned that in asserting jurisdiction over an individual based upon his causing an effect within the state by virtue of an act outside the state, courts must proceed carefully "particularly in an international context." 468 F.2d at 1341. "The person sought to be charged must know, or have good reason to know, that his conduct will have effects in the state seeking to assert jurisdiction over him." *Ibid. Leasco* summed up by stating that "all this reflects the modern notions that where a defendant

has acted within a state or sufficiently caused consequences there, he may fairly be subjected to its judicial jurisdiction even though he cannot be served with process in the state . . . ." *Id.* at 1340.

### Acts within the State

Plaintiff alleges that Robert Laidlaw and Terrence Jackets have committed certain acts while in New York sufficient to confer jurisdiction on this court over them and their corporate principals, SLI and SLM. *See* Restatement (Second) of Conflict of Laws § 36. Specifically, plaintiff alleges that both Laidlaw and Jackets approved of STI's acting as a broker for Financial's repurchase transactions while knowing or constructively knowing that STI had no reliable information as to Financial's fiscal condition, and that they participated in STI's decision not to register as a broker under § 15 of the 1934 Act, 15 U.S.C. § 78*o*.[7] Defendants, on the other hand, assert that they had no knowledge of STI's dealings with Financial until after the default which led to the present litigation. They do not specifically respond to plaintiff's allegations regarding their participation in STI's decision not to register as a broker.

First of all, it is unclear from the present record whether the "acts" which plaintiff alleges took place actually occurred. The parties strongly disagree as to whether there was any approval by Laidlaw and Jackets of STI's dealings with Financial, and plaintiff's contention as to the individual defendants' participation in STI's decision not to register as a broker is based solely on a statement by Nappi (President of STI) that Laidlaw and "perhaps Jackets"

---

**6.** We defer our decision as to jurisdiction with respect to plaintiff's state law claims until discovery is completed. If at that time plaintiff has not established a sufficient jurisdictional base under the federal securities statutes, it is clear that plaintiff has similarly failed to establish jurisdiction as to its state claims. If, on the other hand, plaintiff meets its burden as to jurisdiction on the federal claims, the court will then decide whether it can exercise pendent jurisdiction over plaintiff's state claims, *see*

*Murphey v. Hillwood Villa Associates,* 411 F.Supp. 287, 293 (S.D.N.Y.1976); *Oxford First Corp. v. PNC Liquidating Corp.,* 372 F.Supp. 191, 196 n. 15 (E.D.Pa.1974), or whether it must examine each state claim individually under New York's jurisdictional statutes. *See* N.Y.C.P.L.R. §§ 301–02 (McKinney 1972).

**7.** With respect to this second allegation, plaintiff claims that the defendants were also acting for LS. Plaintiff's memorandum of law at 32.

were present at meetings where the question of registration was discussed.[8]

Assuming that plaintiff establishes that these actions by Laidlaw and Jackets actually occurred, they could conceivably confer jurisdiction over the individual or corporate defendants only as to causes of action *arising from* the acts in question. *See* Restatement (Second) of Conflict of Laws § 36. Thus, for example, plaintiff's claim that Laidlaw and Jackets participated in the decision not to register STI as a broker under the 1934 Act could only confer jurisdiction over the defendants with respect to plaintiff's asserted private right of action under § 15(a).[9] Plaintiff must, therefore, clarify the causal nexus between the acts in question and its proposed theories of recovery. Moreover, since plaintiff is trying to ascribe these actions to the English corporate defendants as well, it must make clear the factual basis for determining to whom these alleged acts should be attributed.

■ Accepted judicial philosophy is to refrain from dismissing securities claims where it is possible that plaintiff can establish a jurisdictional basis for its claims upon completion of additional discovery. *See Leasco Data Processing Equipment Corp. v. Maxwell, supra,* 468 F.2d at 1343; *Alco Standard v. Benalal,* 345 F.Supp. 14 (E.D. Pa.1972); *cf. Surpitski v. Hughes-Keenan Corporation,* 362 F.2d 254 (1st Cir. 1966) (discovery in personal injury action). Plaintiff is, therefore, granted further discovery to establish that the acts it alleges occurred, to whom they should be attributed, and to concretize its theories of recovery so as to clarify the jurisdictional import of the acts in question.

*Acts Outside the Jurisdiction Having Their Effects Within the Jurisdiction*

Plaintiff alleges that while in London, N. H. Woolley approved of STI's dealings with

Financial, on behalf of himself, SLI and SLM, with the knowledge or constructive knowledge that STI had no reliable information as to Financial's fiscal condition. This, plaintiff argues, constitutes an act committed outside the United States with specific forseeable consequences within this country sufficient to support *in personam* jurisdiction over Woolley, SLI and SLM as to all federal causes of action arising from N. H. Woolley's actions. *See* Restatement (Second) of Conflict of Laws § 37; *Leasco Data Processing Equipment Corp. v. Maxwell, supra.*

■ Woolley's affidavit makes clear that he was advised of STI's participation in repurchase transactions,[10] but he claims that no prior approval or consent of the Board of Directors was required. More importantly, the record does not establish precisely what information N. H. Woolley had available to him regarding the scope of STI's dealings with Financial or as to the nature of Financial itself. Nor is it clear from the record when such information was made available to him. Plaintiff must also establish on whose behalf Woolley was acting in allegedly approving STI's business transactions since it seeks to attribute his actions to SLI and SLM. Although mindful of the caveat that jurisdiction based on acts done outside the state with their effects occurring inside the state should be asserted with considerable caution in an international context, *Leasco Data Processing Equipment Corp. v. Maxwell, supra,* 468 F.2d at 1341, plaintiff is granted further discovery to ascertain precisely what actions Woolley took, to clarify those persons or corporations to whom those actions should be attributed, and to further define the causal link between Woolley's actions and plaintiff's proposed theories of recovery.

*Doing Business Within the State*

Plaintiff argues that STI was no more than an "agent," "alter ego" or "mere de-

---

8. Colodner Affidavit # 1 ¶ 14.

9. Courts have differed as to the availability of a private right of action under § 15(a). *Compare Davis v. Avco Corp.,* 371 F.Supp. 782 (N.D. Ohio 1974) *with Mills v. Sarjem Corp.,* 133

F.Supp. 753, 769 (D.N.J.1955). *See* 1A. Jacobs, The Impact of Rule 10b–5 § 3.02[f], at 1–77 (1977). We do not decide that issue at this time.

10. Affidavit of N. H. Woolley ¶ 11.

partment" of LS, SLM and SLI and, for that matter, of N. H. Woolley and his family. Consequently plaintiff contends that LS, SLM, SLI and the Woolleys were all doing business in New York via STI and are subject to jurisdiction here. *See* Restatement (Second) of Conflict of Laws §§ 35, 47.[11]

### Corporate Defendants

Although plaintiff makes this argument primarily in the parallel context of New York's jurisdictional statutes, it might have relied directly on § 52 of the Restatement (Second) of Conflict of Laws. That section provides that a court can exercise jurisdiction over a foreign corporation "if the foreign corporation has such a relationship to the state that it is reasonable for the state to exercise jurisdiction." Focusing on the parent-subsidiary corporate relationship, comment "b" of the Restatement explains that jurisdiction over a parent corporation is not obtained simply because a state has jurisdiction over the subsidiary, even if the parent is the sole shareholder of the subsidiary. Rather, the subsidiary must do an act at the direction of its parent or in the course of its parent's business, or the parent must so control and dominate the subsidiary so as to disregard its independent existence.[12] In articulating this basis of jurisdiction, the Restatement relies heavily on the New York cases in the area. In *Sunrise Toyota, Ltd. v. Toyota Motor Co.,* 55 F.R.D. 519, 528 (S.D.N.Y.1972), Judge Lasker summarized the principles espoused by the New

York cases on this question. "[T]here are two theories by which the Japanese parent corporation may be found to be 'present' in New York: (a) if the relationship between the foreign parents and local subsidiaries gives rise to a 'valid inference' of 'an agency relationship'; and (b) if control by the parent of the subsidiary is 'so complete that the subsidiary is, in fact, merely a department of the parent.'" *Accord, Freeman v. Gordon & Breach Science Publishers, Inc.,* 398 F.Supp. 519 (S.D.N.Y.1975) (Cannella, J.); *Delagi v. Volkswagenwerk A.G. of Wolfsburg, Germany,* 29 N.Y.2d 426, 328 N.Y.S.2d 653, 278 N.E.2d 895 (1972). Thus, the inquiry in the case at bar is whether STI acted as the agent or as a mere department of SLI, SLM or LS.

### SLI

Plaintiff's agency claims rest primarily on the cases of *Gelfand v. Tanner Motor Tours, Ltd.,* 385 F.2d 116 (2d Cir. 1967), *cert. denied,* 390 U.S. 996, 88 S.Ct. 1198, 20 L.Ed.2d 95 (1967), and *Frummer v. Hilton Hotels International,* 19 N.Y.2d 533, 281 N.Y.S.2d 41, 227 N.E.2d 851, *cert. denied,* 389 U.S. 923, 88 S.Ct. 241, 19 N.E.2d 266 (1967). Both of these cases involve reservations made by reservation services in New York for places at the London Hilton, in the case of *Frummer,* and on the defendant motor company's Grand Canyon tours, in the case of *Gelfand.* The decisive test espoused by these cases is whether " 'the [reservation] Service does all the business

---

**11.** Although plaintiff makes its "alter ego" argument on broader grounds than doing business, *i. e.,* that STI was the "alter ego" for all purposes, it is clear that if plaintiff succeeds in showing that STI was the alter ego of the English defendants for purposes of doing business in this country, then they will be subject to jurisdiction here for any and all claims. Plaintiff can then address itself to its broader alter ego contentions for purposes of imposing substantive liability on the defendants.

**12.** Comment (b) provides in pertinent part:
   "Judicial jurisdiction over a subsidiary corporation does not of itself give a state judicial jurisdiction over the parent corporation. This is true even though the parent owns all of the subsidiary's stock. So a state does not have

judicial jurisdiction over a parent corporation merely because a subsidiary of the parent does business within its territory.
   If the subsidiary corporation does an act, or causes effects, in the state at the direction of the parent corporation or in the course of the parent corporation's business, the state has judicial jurisdiction over the parent to the same extent that it would have had such jurisdiction if the parent had itself done the act or caused the effects.
   Judicial jurisdiction over a subsidiary corporation will likewise give the state jurisdiction over the parent corporation if the parent so controls and dominates the subsidiary as in effect to disregard the latter's independent corporate existence."

which [defendant corporation] could do were it here by its own officials.'" *Gelfand v. Tanner Motor Tours, Ltd., supra,* 385 F.2d at 121, *quoting Frummer v. Hilton Hotels International, supra.* In both cases the corporate "agents" generated substantial business on behalf of their foreign principals.

The plaintiff's agency theory of doing business may have some merit with respect to SLI depending on the scope of the Euro-currency transactions carried on in this country between SLI and STI and the manner in which they were conducted. In acting as the broker for these transactions, STI might well be thought of as acting as the agent for SLI. If those transactions were substantial, *see Gelfand v. Tanner Motor Tours, Ltd., supra,* 385 F.2d at 121, then it may be that SLI would be considered to have been doing business here and thus be subject to the jurisdiction of this court. On the other hand, if this Euro-currency business was very small, the other activities of STI would not likely fall within the holdings of *Gelfand* and *Frummer* because those other activities were not related to SLI's activities in Europe in such a way as to enable STI to generate and direct business towards SLI. Rather, any revenue received by SLI from STI's activities arose simply because SLI owned the American company.

■ The second argument put forward by the plaintiff for finding that SLI was doing business in this country is that SLI and STI were in fact a single entity. *See Tokyo Boeki (U.S.A.), Inc. v. S. S. Navarino,* 324 F.Supp. 361 (S.D.N.Y.1971); *Public Administrator v. Royal Bank of Canada,* 19 N.Y.2d 127, 278 N.Y.S.2d 378, 224 N.E.2d 877 (1967); *Taca International Airlines, S.A. v. Rolls-Royce of England, Ltd.,* 15 N.Y.2d 97, 256 N.Y.S.2d 129, 204 N.E.2d 329 (1965). In making the determination as to whether a subsidiary is really an independent entity or a mere department courts have looked to a number of factors. These include common directors, movement of key personnel from company to company, policy conferences involving the top executives of the different companies, training of the em-

ployees of the subsidiary by the parent, consolidated earnings statements, and preparation of literature for the subsidiary by the parent. *See Taca International Airlines, S.A. v. Rolls-Royce of England, Ltd., supra.* In the present case, six of STI's eight directors were also directors of SLI. The Chairman of the Board of STI was and is the managing director of SLI. The finances for STI were provided by a letter of credit guaranteed by SLI's parent—SLM. All matters involving large expenditures or outlays of capital had to be approved by the London directors who were also directors of SLI. Conferences were held in London. In fact, no STI board meeting was ever held in the United States. Two of SLI's employees who were experienced in Euro-currency transactions were sent to aid STI to expand its operations in that area; each continued to receive monthly subsidies from SLI. All these factors lean in favor of finding that the two companies constitute a single entity for jurisdictional purposes.

■ The defendants argue that this case is markedly different from those cases cited by plaintiff. Most importantly, perhaps, they point out that the cases finding a "single entity" have involved dealings in the same product, *see Taca International Airlines, S.A. v. Rolls-Royce of England, supra,* or the same business, *see Public Administrator v. Royal Bank of Canada, supra.* While the businesses in the present case are not as closely related as the businesses in the cases relied on by plaintiff, they all involve market transactions in various currencies or securities. Bearing in mind that jurisdiction under the relevant provisions of the federal securities laws can be exercised to the limits of the due process clause, *see Leasco Data Processing Equipment Corp. v. Maxwell, supra,* 468 F.2d at 1339–40, plaintiff may well be able to establish upon further discovery that STI and SLI are one entity for jurisdictional purposes.

### SLM

Plaintiff similarly argues that SLM is doing business in New York via its sub-subsidiary STI. The agency theory of doing

business is more attenuated here than in the case of SLI because SLM's business and STI's business are not sufficiently related so as to enable STI to forward business to SLM. *See Gelfand v. Tanner Motor Tours, Ltd., supra.* Plaintiff may, however, be able to establish its single entity theory of jurisdiction. It is clear that this theory can apply through a series of corporations. *See Public Administrator v. Royal Bank of Canada, supra.* Four of SLM's directors sat on the board of STI, and SLM supplied the capital for STI by virtue of its guarantee of a letter of credit to STI. Laidlaw, the English defendant who was most involved with STI's affairs, was not a director of SLM, but he was and is a salaried employee of SLM and spends 85% of his time on its affairs. In addition, SLM is sole owner of SLI, which in turn was the sole owner of STI. Plaintiff may, therefore, be able to establish upon further discovery additional connecting factors between SLM and STI sufficient to justify treating them as one unit for jurisdictional purposes.

## LS

█ Finally, plaintiff seeks to establish that LS was doing business in New York by virtue of STI's activities. Plaintiff will not be able to succeed on the theory that LS was doing business in New York via its agent—STI—because their businesses were not sufficiently related to enable STI to generate business for LS in New York. *See Gelfand v. Tanner Motor Tours, Ltd., supra.* Plaintiff may, however, be able to establish that STI was so controlled and dominated by LS that it was really a mere department of LS and consequently LS was doing business in New York under a single entity theory of jurisdiction. *See Taca International Airlines, S.A. v. Rolls-Royce of England, Ltd., supra.* Thus far, plaintiff has established that LS is the ultimate parent of all four corporate defendants. Four of LS's six directors were also directors of STI, and the financial statements of STI were consolidated with those of LS for pur-

poses of the filings required by the Companies Registry in London. Although the interconnections between LS and STI are not as strong as those of SLM or SLI and STI, plaintiff may be able to establish that these four corporations are really one enterprise for jurisdictional purposes. Plaintiff has certainly made a sufficient threshold showing to justify the taking of the additional discovery it seeks to flesh out the interrelationships among the various corporate defendants so as to attempt to establish its asserted jurisdictional basis.

### Individual Defendants: The Woolleys

In support of its contention that the Woolleys should be considered to be doing business in New York via their "alter ego," STI, *see* Restatement (Second) of Conflict of Laws § 35; *cf.* § 52, plaintiff relies on a number of factors. Sun points out that N. H. Woolley, N. E. Woolley, and Ian Woolley together with their families own 40% of the shares of LS—STI's ultimate parent.[13] In addition, each of the Woolleys is a director of LS, SLM, SLI, and was a director of STI while it was in existence. Moreover, N. H. Woolley was the Chairman of the Board of STI and is the managing director of the other three corporations. Two of the Woolleys travelled to the United States in connection with STI's affairs. Thus, N. E. Woolley came to New York twice. The first trip was the original exploratory visit during which the idea for the formation of STI was broached; the second trip was to attend an STI cocktail party. N. H. Woolley came to the United States only once to discuss the possibility of opening up a branch office of STI in San Francisco. Ian Woolley never came to the United States. The degree to which the three Woolleys were kept abreast of STI affairs also varied. Thus, N. H. Woolley received periodic reports on STI's status; N. E. Woolley met with Nappi, STI's president, while Nappi was in London on several different occasions and engaged in some general business

---

13. N. H. Woolley personally owns 2,800 shares of LS stock, and together with his wife and two adult daughters he owns 25,485 of the 105,000 shares of LS stock outstanding. N. E. Woolley and Ian Woolley each own 7,504 shares of LS stock.

discussions; and Ian Woolley received information as to STI's status only by way of the other STI directors located in London.

■ By analogy to those cases involving a piercing of the corporate veil for purposes of asserting jurisdiction over a parent corporation by virtue of the activities of its subsidiaries, it is clear that plaintiff must show, at the very least, a complete domination and control of STI's activities by the Woolley family in order to assert jurisdiction over them based on STI's activities within the forum. *See, e. g., Tokyo Boeki (U.S.A.), Inc. v. S.S. Navarino, supra;* Restatement (Second) of Conflict of Laws § 52, comment (b). Moreover, when seeking to disregard the corporate entity to assert jurisdiction over individuals an even greater showing may be required. *Cf.* Wright & Miller, Federal Practice & Procedure Civil § 1069, at 28 (1976 Supp.). Only "where the corporation is not a viable one and the individuals are in fact conducting personal activities and using the corporate form as a shield" will courts pierce the corporate veil to assert personal jurisdiction over the individuals involved. *Ibid; see Certified Building Products, Inc. v. N.L.R.B.,* 528 F.2d 968 (9th Cir. 1976); *Holfield v. Power Chemical Corp.,* 382 F.Supp. 388 (D.Md.1974). Although we harbor serious doubts as to plaintiff's ability to succeed on this jurisdictional claim, Sun is granted the discovery it seeks to attempt to substantiate its jurisdictional allegations.

*Directorships*

■ Plaintiff argues that when each of the individual defendants accepted a directorship on STI's board, they accepted the privileges and the protections of both the laws of New York and the federal securities laws and cannot now be heard to complain of the assertion of jurisdiction over them by this court. Presumably, plaintiff could look to § 39 of the Restatement (Second) of Conflict of Laws which provides that a state can also exercise jurisdiction over an individual in situations "where the individual has such a relationship to the state that it is reasonable for the state to exercise such jurisdiction." The Supreme Court has just stated, however, that the acceptance of a directorship does not demonstrate that directors have " 'purposefully avail[ed themselves] of the privilege of conducting activities within the forum State.' " *Shaffer v. Heitner,* 433 U.S. 186, 215–16, 97 S.Ct. 2569, 2586, 53 L.Ed.2d 683 (1977). Moreover, there is no state or federal statute which would have put the directors on notice that the acceptance of a directorship would confer jurisdiction over them in American courts. It would seem to be a violation of "notions of fair play and substantial justice" to subject a director to the jurisdiction of the court solely on the basis of his acceptance of the directorship, particularly when this element of statutory notice is absent. *See Ibid.; International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

*Controlling Persons*

Plaintiff contends that all the English defendants in this action are "controlling persons" of STI within the meaning of § 20 of the 1934 Act, 15 U.S.C. § 78t and § 15 of the 1933 Act, 15 U.S.C. § 77o, and consequently all the actions of STI are attributable to them and subject them to the jurisdiction of this court. The individual defendants are alleged to be controlling persons of STI by virtue of their directorships and their status as designated representatives of STI's sole shareholder, SLI. In addition, the Woolleys themselves own 40% of LS—the ultimate parent of STI, thus providing additional elements of control. The corporate defendants are claimed to be controlling persons by virtue of their sole ownership, directly or indirectly, of STI's shares and their control over its board of directors.

■ "The issue of 'control' is a complex fact question which requires an examination of the relationships of the various alleged 'controlling persons' to the person or entity which transacted the sale of securities alleged to have violated the Act.' " *Klapmeier v. Telecheck International, Inc.,* 315 F.Supp. 1360, 1361 (D.Minn.1970), *rev'd on other grounds,* 482 F.2d 247 (8th Cir. 1973). In making a determination as to the

existence of "control," many courts have looked to the "power or potential power to influence and control the activities of a person, as opposed to the actual exercise thereof." *Rochez Brothers, Inc. v. Rhoades,* 527 F.2d 880, 890–91 (3rd Cir. 1975); *see Harriman v. E. I. DuPont De Nemours & Co.,* 372 F.Supp. 101 (D.Del.1974); *Moerman v. Zipco., Inc.,* 302 F.Supp. 439, 447 (E.D.N.Y. 1969), *aff'd,* 422 F.2d 871 (2nd Cir. 1970); 1A. Jacobs, The Impact of Rule 10b–5 § 40.04, at 292 (1977). Plaintiff's showing on the present record is, to say the least, sufficiently probative on the question of control to allow it to go forward and take additional discovery to further illuminate the interrelationships between the English defendants and STI. *See Klapmeier v. Telecheck International, Inc., supra; In re Sterling Homex Corporation Securities Litigation,* [1976-77 Transfer Binder] Fed.Sec. L.Rptr. (CCH) ¶ 95,904 (S.D.N.Y.1977); *Jezarian v. Czapo,* [1972-73 Transfer Binder] Fed.Sec.L.Rptr. (CCH) ¶ 93,795 (S.D.N.Y. 1973).

■ It seems clear, however, that at least with respect to plaintiff's § 10(b) claims, plaintiff must establish some level of culpable participation on the part of the English defendants before they would be required to vindicate their actions by a showing of good faith in order to avoid liability. *See Gordon v. Burr,* 506 F.2d 1080, 1086 (2d Cir. 1974); *Lanza v. Drexel & Co.,* 479 F.2d

1277, 1299 (2d Cir. 1973). While both *Lanza* and *Gordon* relate to the merits of plaintiff's claim, this court has previously suggested that this element of culpable participation may provide a constitutionally necessary causal link between the actions of the primary perpetrator of some alleged misconduct and the individual sought to be subjected to jurisdiction by virtue of his status as a controlling person of the primary wrongdoer. *See Leasco Data Processing Equipment Corp. v. Maxwell,* 68 F.R.D. 178, 184 (S.D.N.Y.1974). The complex constitutional question of the precise nature of the showing plaintiff must make before the acts of a controlled person may be attributed to the controlling person for jurisdictional purposes should not be decided on the basis of the incomplete record presently before us and without the benefit of counsels' briefs specifically directed toward that question.[14] We, therefore, defer our decision until completion of the additional discovery which plaintiff is now granted.

Accordingly, defendants' motion to dismiss is denied with leave to renew upon plaintiff's completion of discovery.

IT IS SO ORDERED.

---

**14.** Plaintiff urges that the decisions in this court in *Ferraioli v. Cantor,* 259 F.Supp. 842 (S.D.N.Y.1966) (Levet, J.), and *SEC v. VTR,* 39 F.R.D. 19 (S.D.N.Y.1966) (Metzner, J.), compel the conclusion that if the English defendants are held to be controlling persons, they are automatically subject to suit here by virtue of that status. Neither of the cited decisions is determinative in the instant situation. In *Ferraioli,* the court held that a Canadian corporation which had acquired a controlling interest in an American corporation and then sold it at a premium, without first having informed the American stockholders of the outstanding offer for the shares, was subject to suit in New York. The court stated that where a foreign corporation controlled a United States corporation with its executive offices in the district, and where the cause of action arose directly from that control, the necessary minimum contacts for the assertion of jurisdiction were present. 259 F.Supp. at 847. Although the language of

*Ferraioli* is very broad, the facts of the case involved primary wrongdoing on the part of foreign defendants with clear, foreseeable effects in New York and would clearly fall within that section of the Restatement providing for the assertion of jurisdiction based upon acts done outside the jurisdiction and having their foreseeable effects within the jurisdiction. *See* Restatement (Second) of Conflict of Laws § 37. In the present case no such primary misconduct has been established. Nor is *SEC v. VTR, supra,* determinative of the instant situation since that case involved an express agent of a foreign corporation selling unregistered shares in this country on behalf of that corporation. The court stated that "The fact that an agent performed the activity does not affect its impact," *SEC v. VTR, supra,* 39 F.R.D. at 22, and held the foreign corporation to be subject to jurisdiction. No such express agency relationship exists here.